IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32866-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| DANIEL BLIZZARD, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Due process requires a fair trial in a fair tribunal. Daniel Blizzard argues he was denied this basic protection after his trial judge received a letter from the county prosecutor containing inflammatory accusations of judicial bias. According to Mr. Blizzard, the letter's contents were so explosive they rendered the trial judge incapable of fairly presiding over the proceedings.

We are unpersuaded. The judiciary is not vulnerable to manipulation by politically charged criticism. In extreme cases, hurtful, personal attacks against a judge may make

recusal unavoidable. This is not such a case. We reject Mr. Blizzard's broad attack against his conviction, along with his other claims of more discrete error. The judgment and sentence is affirmed.

## BACKGROUND

On May 25, 2013, real estate broker Vern Holbrook was found lying in a pool of blood in a vacant house he reportedly showed to a couple earlier that day. He had been severely beaten and his throat was cut. Mr. Holbrook later died as a result of the injuries sustained in the attack.

An investigation of Mr. Holbrook's cell phone records and witness interviews led law enforcement to Mr. Blizzard. The State's theory was essentially a murder for hire scheme. Mr. Holbrook and Mr. Blizzard were former business partners. Although there had been a falling out between the two men, Mr. Blizzard was the beneficiary of Mr. Holbrook's life insurance policy. Prior to the May 2013 attack, Mr. Blizzard tried recruiting various people to kill Mr. Holbrook. As part of this effort, he enlisted the help of his sometimes-girlfriend, Jill Taylor. Ms. Taylor also happened to be Mr. Holbrook's former daughter-in-law. Eventually, Mr. Blizzard recruited Ms. Taylor's roommate, Adriana Mendez, and Ms. Mendez's boyfriend, Luis Gomez-Monges, to pose as prospective homebuyers and attack Mr. Holbrook during a home tour.

Mr. Blizzard, Ms. Mendez, Mr. Gomez-Monges, and Ms. Taylor were charged in connection with Mr. Holbrook's murder. During the pretrial phase of the case, Mr. Blizzard moved to suppress records related to his cell phone. He argued the warrants authorizing seizure of his cell phone records were invalid due to procedural and substantive flaws.

Just prior to a hearing scheduled to address the cell phone warrants, the trial judge received a letter authored by the county's elected prosecutor.[1] In the letter, the prosecutor alleged the trial judge had "a bias and prejudice against the Yakima County Prosecuting Attorney's Office." Clerk's Papers (CP) at 835. He criticized the trial judge's handling of Mr. Blizzard's case as well as others. The prosecutor claimed the trial judge personally disliked several prosecutors and "bent over backwards" to favor the defense. CP at 834. He alleged the trial judge's bias made it "impossible for the State to get a fair trial." CP at 835. Ultimately, the prosecutor requested the trial judge recuse herself or be removed by the presiding judge.

The trial judge brought the letter to the parties' attention. The judge noted she had consulted with the state's judicial ethics advisory committee. She expressed concern that the letter was improper ex parte contact and constituted an attempt to intimidate the court.

---

[1] The elected prosecutor at issue no longer holds office.

The trial judge provided the State with a deadline for filing a formal recusal motion and set a briefing schedule.

The State never filed a formal motion for recusal. Instead, the State's lead deputy prosecutor assigned to this case filed a notice of abandonment, disavowing the recusal request. Mr. Blizzard, in turn, filed a motion to dismiss under CrR 8.3(b) for prosecutorial misconduct based on the letter. The trial court denied Mr. Blizzard's motion and continued to hear the case.

Shortly after ruling on Mr. Blizzard's motion to dismiss, the trial court denied his motion to suppress the cell phone records. The court ultimately ruled on numerous additional motions, including a second motion to dismiss based on an allegation the State had intercepted attorney-client communications. While the judge denied this second motion to dismiss, not all the court's rulings favored the State. Significantly, the trial judge granted a defense motion to prohibit the State from filing enhanced charges, which could have resulted in a mandatory life sentence.

At trial, codefendants Adriana Mendez and Jill Taylor turned state's evidence and testified against Mr. Blizzard. Codefendant Luis Gomez-Monges was tried separately. A jury found Mr. Blizzard guilty of first degree murder. By special verdict, it also found

4

No. 32866-0-III
*State v. Blizzard*

(1) Mr. Blizzard was armed with a deadly weapon,[2] and (2) Mr. Holbrook was

particularly vulnerable or incapable of resistance. Mr. Blizzard appeals.

## ANALYSIS

*The County Prosecutor's Letter*

Mr. Blizzard focuses his appeal on various legal harms purportedly caused by the

county prosecutor's letter. According to Mr. Blizzard, the letter violated separation of

powers, constituted prosecutorial misconduct, and deprived him of a fair trial. We need

not address these concerns serially in a complicated, multi-faceted manner. The county

prosecutor's letter could only implicate separation of powers if it was so powerful and

divisive that it had the capacity to threaten the judge's independence. *See Zylstra v. Piva*,

85 Wn.2d 743, 750, 539 P.2d 823 (1975). Similarly, any misconduct by the prosecutor in

issuing the letter would only warrant reversal if it fundamentally undermined the fairness

of the proceedings. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). In

sum, regardless of whether the prosecutor was attempting to engage in misconduct or

invade the independence of the judiciary, the issue to be decided is whether the letter

---

[2] Prior to commencing deliberations, the court instructed the jurors, in part: "If one participant in a crime is armed with a deadly weapon, all accomplices to that participant are deemed to be so armed, even if only one deadly weapon is involved." CP at 2691.

5

deprived Mr. Blizzard of his right to a fair trial before a fair tribunal.

Fair trial claims fall into two categories: due process and claims under the "appearance of fairness doctrine." Due process is a constitutional requirement. It establishes the minimal requirements for a fair hearing. The appearance of fairness doctrine provides greater protection. It permits litigants to make fair trial claims based on violations of the Code of Judicial Conduct (Code), regardless of whether those claims implicate due process. *Tatham v. Rogers*, 170 Wn. App. 76, 91-93, 283 P.3d 583 (2012).

Because a complaint under the appearance of fairness doctrine is not constitutional, it generally cannot be raised for the first time on appeal. Once a basis for recusal is discovered, prompt action is required. *In re Pers. Restraint of Swenson*, 158 Wn. App. 812, 818, 244 P.3d 959 (2010). Delaying a request for recusal until after the judge has issued an adverse ruling is considered tactical and constitutes waiver. *Id.*; *State v. Bolton*, 23 Wn. App. 708, 714, 598 P.2d 734 (1979). [3]

Mr. Blizzard never asked the trial judge to recuse herself. He claims doing so would have impaired his speedy trial rights. But this concern is always present in criminal cases. Mr. Blizzard fails to explain how his case is different or what type of

---

[3] The appearance of fairness doctrine involves an objective inquiry into the impact of prejudice on a judge. *Swenson*, 158 Wn. App. at 818. As a result, there is no need to wait and see whether an improper influence will impact a judge's rulings.

6

delay would have occurred had his case been assigned to a different judge. Less than a year passed between Mr. Blizzard's arraignment and the start of trial. From a constitutional perspective, this was prompt. *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). We fail to detect any obvious reason why Mr. Blizzard could not have sought recusal in a timely manner. We therefore decline to craft a generalized speedy trial exception that would swallow the well established rule requiring a prompt motion.

Relief from waiver would be especially inappropriate here as the record indicates Mr. Blizzard's decision not to seek recusal was tactical. The county prosecutor's letter was disclosed on May 28, 2014. Trial did not begin until late August 2014. During the period between these two dates, Mr. Blizzard appeared before the trial judge numerous times and filed significant pleadings.[4] Yet he made no request for recusal. Mr. Blizzard's actions demonstrated a willingness to "take his chances" with the trial judge. *Bolton*, 23 Wn. App. at 714-15. This strategy proved fruitful. The trial judge saved Mr. Blizzard from facing a mandatory life sentence by granting the defense motion to prohibit the State from filing enhanced charges; the judge excluded a State witness from testifying on grounds of hearsay; and the judge ultimately imposed a much lower sentence than what

---

[4] *See, e.g.,* CP at 985, 1033 and 1062.

7

was requested by the prosecution.[5] Mr. Blizzard cannot now go back on his choice to remain with the trial judge simply because he has been convicted. Appellate review under the appearance of fairness doctrine has been waived. *Id.*

Our due process analysis requires a different approach. Denial of the constitutional right to a fair tribunal is a structural error that requires reversal regardless of prejudice. *Williams v. Pennsylvania,* __ U.S. __, 136 S. Ct. 1899, 1909-10, 195 L. Ed. 2d 1208 (2016). The rules of appellate procedure permit review of Mr. Blizzard's constitutional claim even though it was not previously raised in the trial court. RAP 2.5(a)(3).

Due process generally involves an objective analysis.[6] We ask "not whether a judge harbors an actual, subjective bias, but instead whether as an objective matter, the average judge in his position is likely to be neutral or whether there is an unconstitutional

---

[5] The prosecution requested a total sentence of 600 months, or 50 years. The judge imposed 416 months, or 34 years. Mr. Blizzard was not yet 30 at the time of sentencing. The trial court's discretionary rulings saved Mr. Blizzard from potentially spending the rest of his life in prison.

[6] A due process claim can stand in the rare case where a judge admits to actual bias but fails to recuse. *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 883, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009). Although never formally asked to recuse herself, the trial court volunteered that she had "absolutely no question" in her mind she could be fair and impartial in Mr. Blizzard's case. Verbatim Report of Proceedings (May 28, 2014) at 496.

8

potential for bias." *Williams*, 136 S. Ct. at 1905 (internal quotation marks omitted) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009).

Through our country's significant history of litigation, only three circumstances have been found to create unconstitutional judicial bias: (1) when a judge has a financial interest in the outcome of a case, (2) when a judge previously participated in a case in an investigative or prosecutorial capacity, and (3) when an individual with a stake in a case had a significant and disproportionate role in placing a judge on the case through the campaign process. *Caperton*, 556 U.S. at 877-884. In addition, the Supreme Court has suggested, though not held, there may be an impermissible risk of bias when a judge is the recipient of personal criticisms that are highly offensive. *Ungar v. Sarafite*, 376 U.S. 575, 583, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964).

The circumstances presented by Mr. Blizzard do not fall into any of the three established categories of bias. He instead draws on the analysis suggested by *Ungar* that the county prosecutor's letter to the judge was "so personal and so probably productive of bias" the trial judge was constitutionally required to recuse herself. *Id.* The argument is the county prosecutor's letter was so incendiary that a reasonable person could not help but conclude the judge would feel intimidated and therefore pressured to issue future

9

rulings in favor of the State.

Even if we were to accept that *Ungar* recognized a fourth category of impermissible bias, it does not apply in Mr. Blizzard's case. The criticisms lodged against the judge in this case were professional, not personal. They do not fall within the scope of potential prejudice contemplated by *Ungar*. Judges are required by the Code to disregard criticisms such as those lodged in this case. CJC Rule 2.4(A) ("judge shall not be swayed by public clamor, or fear of criticism"). As recognized in *Ungar*, "[w]e cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions." *Ungar*, 376 U.S. at 584. Professional criticisms, no matter how inaccurate or improper, do not meet this standard. A judge's duty to decide all cases presented to the court remains paramount.

Before considering Mr. Blizzard's remaining arguments, we briefly return to the concept of separation of powers. Mr. Blizzard argues the county prosecutor's letter threatened to undermine the balance of powers between the judicial and executive branches of government. We agree this is a basis for concern. But it is a concern that would only become manifest were we to grant relief. There must be consequences to prosecutorial misconduct. However, dismissal is not always the appropriate response.

10

Dismissal in this case would not punish the prosecutor. With dismissal, the executive branch might lose an individual case, but it would gain daunting power. A rule requiring recusal in cases such as Mr. Blizzard's would enable the executive to manipulate the judiciary and force future recusals at virtually any juncture of the proceedings simply by hurling politically charged attacks. Dismissal would not punish the executive. It would punish the judiciary. It would also punish Mr. Holbrook's family. The very need to preserve separation of powers requires that Mr. Blizzard's challenge be denied.

## *Validity of the Search Warrants*

Mr. Blizzard contends the trial court erred in admitting contents of his cell phone records because they were not obtained pursuant to valid search warrants. His challenges are both procedural and substantive. Our review is de novo. *State v. Miles*, 159 Wn. App. 282, 291, 244 P.3d 1030 (2011); *State v. Dunn*, 186 Wn. App. 889, 896, 348 P.3d 791 (2015).

### *Procedural challenges*

The warrants under review were issued by the Yakima County Superior Court after similar warrants had been issued by the district court. The reason for reissuance was that the State became concerned the district court lacked jurisdiction to issue warrants for out-

11

of-state corporations. Because the State does not attempt to defend the district court warrants, we operate under the assumption they were invalid.

Mr. Blizzard challenges the superior court warrants on the basis that they were obtained in reliance on information learned from the invalid district court warrants. Were this argument factually accurate, there would be a strong argument for suppression. Illegally obtained information cannot be used to support probable cause for a warrant. *State v. Ridgway*, 57 Wn. App. 915, 919, 790 P.2d 1263 (1990). But the facts are not as suggested by Mr. Blizzard. The new information referenced by Mr. Blizzard pertains to a change in the company that owned Mr. Blizzard's cell phone lines. According to the record, the State learned Mr. Blizzard's cell phone lines had been sold to a new company through a series of law enforcement phone calls to cell phone company representatives. This new information was not obtained by reviewing search warrant returns. Nor was it obtained by exploiting the existence of the invalidly issued warrants.[7] Because the State independently discovered the change in phone companies, this information was properly

---

[7] One of the phone calls was to GOGII, Inc., the purchaser of Mr. Blizzard's phone lines. A representative from GOGII confirmed the company had purchased Mr. Blizzard's phone lines. This confirmation was received prior to any application for a warrant to search GOGII's records. Thus, there can be no claim the State exploited an improperly issued warrant to obtain this information. *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

12

included in the superior court warrant application and does not provide a basis for suppression. *State v. Gaines*, 154 Wn.2d 711, 718, 116 P.3d 993 (2005).

Mr. Blizzard next argues the superior court warrant was invalid because it lacked the following statutorily mandated language: "This warrant is issued pursuant to RCW 10.96.020. A response is due within twenty business days of receipt, unless a shorter time is stated herein, or the applicant consents to a recipient's request for additional time to comply." RCW 10.96.020(2).

Unless constitutional considerations are in play, the rules for the execution and return of a search warrant are basically ministerial in nature. *State v. Kern*, 81 Wn. App. 308, 311, 914 P.2d 114 (1996). Generally, unless a defendant can show prejudice, procedural noncompliance with these rules does not invalidate a warrant or otherwise require suppression of evidence. *Id.*; *see also State v. Parker*, 28 Wn. App. 425, 426-27, 626 P.2d 508 (1981) (officer served unsigned copy of warrant); *State v. Smith*, 15 Wn. App. 716, 719, 552 P.2d 1059 (1976) (warrant failed to designate a magistrate for return); *State v. Bowman*, 8 Wn. App. 148, 150, 504 P.2d 1148 (1972) (officer failed to properly serve defendant with warrant); *State v. Wraspir*, 20 Wn. App. 626, 629, 581 P.2d 182 (1978) (officer failed to take inventory in presence of other person). Mr. Blizzard has not shown or argued the warrants' failure to specify the time of its execution and return

13

prejudiced him in any way. The object of the search was not transitory or changeable or stale. The dangers inherent in delay in execution were not implicated. The search warrant was valid, despite the absence of the required language.

### Substantive challenge

Substantively, Mr. Blizzard claims the search warrants were not supported by probable cause. Probable cause to support a search warrant requires sufficient facts and circumstances establishing a reasonable inference that the defendant participated in criminal activity and that evidence of the crime will be found in the area to be searched. *State v. Dunn*, 186 Wn. App. 889, 895-96, 348 P.3d 791 (2015).

The superior court warrant set forth numerous facts linking Mr. Blizzard's cell phone lines with the Holbrook investigation. The affidavit disclosed that Mr. Blizzard's company held a $1.58 million life insurance policy on Mr. Holbrook. The affidavit also recited Ms. Mendez's confession that she and Mr. Gomez-Monges had posed as fake homebuyers and that Mr. Gomez-Monges had attacked Mr. Holbrook while viewing a prospective property. Although at the time Ms. Mendez denied the existence of a conspiracy, she admitted to knowing Mr. Blizzard. In addition, Ms. Mendez's phone records showed text messages between herself and Mr. Blizzard on the day of the attack. The manager at Ms. Mendez's hotel identified Mr. Blizzard as the individual who had

14

been paying Ms. Mendez's rent. The manager recalled Mr. Blizzard stating he was suing Mr. Holbrook's real estate company and was expecting to come in to a large sum of money. This comment tended to corroborate the statements from Mr. Holbrook's family members, alleging bad blood between Mr. Blizzard and Mr. Holbrook.

While the information set forth in the affidavit may not have been enough to secure a conviction, it was sufficient to establish probable cause. The affidavit established motive and an apparent conspiracy between Mr. Blizzard and Mr. Holbrook's attackers. Because Mr. Blizzard and Ms. Mendez were contacting each other via text message on the day of the attack, it was reasonable to infer that evidence about the attack would be found on Mr. Blizzard's cell phone.

*Attorney-Client Communications*

While Mr. Blizzard was in pretrial custody, staff from the Yakima County jail confiscated paperwork from his cell during a routine security sweep. The paperwork turned out to be trial preparation materials, including discovery documents, defense investigative memos, and handwritten notes. Based on this intrusion into his private paperwork, Mr. Blizzard filed a motion to dismiss for governmental misconduct under CrR 8.3(b).

Dismissal under CrR 8.3(b) is an "extraordinary remedy." *State v. Puapuaga*, 164 Wn.2d 515, 526, 192 P.3d 360 (2008). Even in the context of an improper intrusion into confidential attorney-client communications, dismissal is unwarranted if there is "no possibility of prejudice to the defendant." *State v. Peña Fuentes*, 179 Wn.2d 808, 819, 318 P.3d 257 (2014). The State bears the heavy burden of proving lack of prejudice beyond a reasonable doubt. *Id* at 819-20.

The trial judge considered Mr. Blizzard's CrR 8.3(b) motion after conducting a lengthy evidentiary hearing. At the close of the hearing, the judge found the contents of the confiscated materials had never been shared with anyone involved in the prosecution team, including law enforcement officers. The lead case agent did not even know Mr. Blizzard's documents had been confiscated until the defense filed a motion to dismiss. The trial judge found that while some jail staff saw Mr. Blizzard's documents, no one looked at the materials in detail. In addition, no one with access to Mr. Blizzard's documents discussed the contents with anyone else.

Mr. Blizzard assigns no error to the trial court's factual findings; as such, they are verities on appeal. *State v. Perrow*, 156 Wn. App. 322, 325, 231 P.3d 853 (2010). The trial judge's findings are sufficient to justify denial of the motion to dismiss. What little information was obtained by jail staff was never shared with the prosecution or law

16

enforcement investigators. Because there was no possibility that seizure of Mr. Blizzard's documents benefited the State or prejudiced the defense, dismissal was unwarranted. *Peña Fuentes*, 179 Wn.2d at 821-22.

*Additional Prosecutorial Misconduct*

Mr. Blizzard argues additional misconduct by the State exacerbated the structural error caused by the county prosecutor's letter. Our ruling regarding the county prosecutor's letter undercuts his claim. In any event, none of the alleged remaining errors warrant reversal.

*Standard of review*

To succeed on a prosecutorial misconduct claim, a defendant must show not just improper conduct, but also prejudice. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Usually misconduct claims can be efficiently remedied at the trial court stage of the proceedings. A defendant who waits until appeal to raise misconduct arguments bears a heavy burden. We will only reverse if prosecutorial misconduct is "so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

*Alleged discovery violation*

Mr. Blizzard argues the State committed misconduct when it failed to identify the text messages it intended to use at trial, in violation of a court order. The record shows otherwise. During a pretrial proceeding, the State represented it intended to introduce 150 pages of text messages at trial. This was pared down from 30,000 pages originally contained in the discovery. The trial judge accepted the State's representation as satisfying the court's order. Defense counsel responded, "[t]hat's fine." Verbatim Report of Proceedings (July 30, 2014) at 1222. No discovery violation occurred.

*Abortion testimony*

Mr. Blizzard asserts the State introduced prejudicial character evidence by eliciting testimony from Jill Taylor that Mr. Blizzard impregnated her on three occasions and terminated each pregnancy through abortion. At the time of Ms. Taylor's testimony, the defense did not object on the basis of either improper character evidence or prosecutorial misconduct. Had character been a concern, Mr. Blizzard could have sought a curative instruction. But he did not. Instead, defense counsel asked Ms. Taylor further questions about the abortions and mentioned the abortions in closing argument. Mr. Blizzard's request for relief based on the abortion testimony is denied as waived.

18

No. 32866-0-III
*State v. Blizzard*

*Foundation for text messages*

Mr. Blizzard contends the State did not establish a foundation for admission of the text messages taken from his phone. This is a claim of evidentiary error. It cannot even loosely be classified as prosecutorial misconduct. Reviewing the trial judge's evidentiary rulings for abuse of discretion, *State v. Bradford*, 175 Wn. App. 912, 927, 308 P.3d 736 (2013), we find no error.

The text messages were never fully admitted to the jury. Although various witnesses testified about some of the messages, copies of the actual text records were never published to the jury or sent back to the jury room. When the jury submitted a question during deliberations, asking if the text messages had been admitted, they were told they had received all admitted evidence. Given the jury never received copies of the text message exhibits, the scope of Mr. Blizzard's evidentiary challenge is quite limited.

Particularly given the nature of the evidence shared with the jury, the State established a sufficient foundation. The text messages in question were either between Mr. Blizzard and Ms. Mendez or Mr. Blizzard and Ms. Taylor. Both Ms. Mendez and Ms. Taylor testified at trial and identified the text messages as ones between themselves and Mr. Blizzard. Although Ms. Mendez could not recall Mr. Blizzard's cell phone number, she recognized the content of the text messages, and Ms. Taylor confirmed Mr.

19

Blizzard's number. Mr. Blizzard's cell number was also confirmed by testimony regarding the search of the cell phone that had been seized from Mr. Blizzard at the time of his arrest. Because competent, first-hand evidence tied Mr. Blizzard's cell phone to the text messages, the State presented sufficient evidence of authenticity to allow presentation of its evidence. *State v. Young*, 192 Wn. App. 850, 369 P.3d 205 (2016).

*Cell phone record testimony*

Finally, Mr. Blizzard claims the State introduced testimony regarding cell phone records and cell phone location without proper foundation. Again, this error is at most evidentiary, not misconduct. Nevertheless, as is true in the misconduct context, we will not reverse for evidentiary error absent prejudice to the defense. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984).

The cell phone evidence at issue in this portion of Mr. Blizzard's argument did not pertain to Mr. Blizzard. The phone records pertained to Mr. Holbrook and the cell phone location evidence pertained to Ms. Mendez. The State introduced this evidence to corroborate Ms. Mendez's testimony that she had been in contact with Mr. Holbrook prior to the assault and that she was near him at the time of the assault. Neither of these facts was contested by the defense. The defense theory was that Ms. Taylor had been responsible for recruiting Ms. Mendez and Mr. Gomez-Monges to kill Mr. Holbrook.

20

No. 32866-0-III
*State v. Blizzard*

This theory was not undermined by the introduction of Ms. Mendez's and Mr. Holbrook's cell phone evidence. Any evidentiary error was harmless.

## CONCLUSION

Mr. Blizzard received a fair trial, administered by an impartial judge. He suffered no meritorious claims of error. The judgment and sentence is affirmed.

_____
Pennell, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

21