
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32919-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS GOMEZ-MONGES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Luis Gomez-Monges appeals his conviction for the first degree murder of Vern Holbrook, challenging the sufficiency of the evidence, the trial court's refusal to dismiss the charge against him despite finding prosecutorial misconduct, and the imposition of discretionary legal financial obligations (LFOs) without a sufficient inquiry into his ability to pay.

The trial court's refusal to dismiss murder charges on account of prosecutorial misconduct was addressed in this court's decision in the appeal of Daniel Blizzard, another individual convicted of Mr. Holbrook's murder. The refusal to dismiss the murder charges was upheld because while prosecutorial misconduct was demonstrated, deprivation of Mr. Blizzard's right to a fair trial before a fair tribunal was not. The same

No. 32919-4-III
*State v. Gomez-Monges*

is true here. For that reason, and because the evidence was sufficient, we affirm the

conviction. We remand the judgment and sentence with directions to strike the LFOs.

FACTS AND PROCEDURAL BACKGROUND

Vernon Holbrook owned and served as the real estate broker for Aspen Real

Estate in Yakima. On May 25, 2013, he was found beaten and with his throat cut, lying

in a pool of blood in a vacant house he had arranged to show to a couple earlier that day.

Mr. Holbrook later died of his injuries.

Mr. Holbrook was known by co-workers to "[do] everything with his cellphone,"

but on the night he was found injured, his phone was not at the crime scene or in his

truck, which was found parked outside. Report of Proceedings (RP)[1] at 1522. Yakima

County Sheriff's Detective Sam Perrault made an exigent circumstances request to the

telephone carrier within hours of Mr. Holbrook being found and determined that Mr.

Holbrook's phone was no longer active. By the next day, the detective had been able to

obtain Mr. Holbrook's call records and determine that the last call to connect with his

phone had been made at 11:15 a.m. on May 25, from a phone owned by Adriana Mendez.

On May 27, 2013, detectives met with Ms. Mendez and were provided with the names of

Luis Gomez-Monges, Daniel Blizzard, and Jill Taylor.

---

[1] Unless otherwise noted, all report of proceedings citations refer to RP (Jan. 10, 2014).

2

Concluding that Mr. Gomez-Monges had been the hit man in a murder for hire scheme, the State charged him with attempted first degree murder and first degree assault. Ms. Mendez, Ms. Taylor, and Mr. Blizzard were also charged in connection with the crime. Mr. Blizzard had done the hiring; he was Mr. Holbrook's former business partner and the beneficiary of a $1.58 million keyman life insurance policy acquired before the two men had a falling out. Before the May 25 attack, Mr. Blizzard had tried to recruit others to kill Mr. Holbrook. His relationship with his sometimes-girlfriend, Ms. Taylor, led him to Ms. Taylor's roommate, Ms. Mendez, and Ms. Mendez led him to her boyfriend, Mr. Gomez-Monges.

During the pretrial phase of the cases against the four defendants, the trial judge received a copy of a letter, critical of her, that had been directed to the presiding judge by the county's elected prosecutor.[2] This court's opinion in Mr. Blizzard's appeal of his murder conviction describes the court's handling of the letter:

> In the letter,[3] the prosecutor alleged the trial judge had "a bias and prejudice against the Yakima County Prosecuting Attorney's Office." He criticized the trial judge's handling of Mr. Blizzard's case as well as others. The prosecutor claimed the trial judge personally disliked several prosecutors and "bent over backwards" to favor the defense. He alleged the trial judge's bias made it "impossible for the State to get a fair trial." Ultimately, the prosecutor requested the trial judge recuse herself or be removed by the presiding judge.

---

[2] The elected prosecutor who wrote the letter no longer holds office.

[3] The letter appears at pages 338-41 of the clerk's papers in this appeal.

3

> The trial judge brought the letter to the parties' attention. The judge noted she had consulted with the state's judicial ethics advisory committee. She expressed concern that the letter was improper ex parte contact and constituted an attempt to intimidate the court. The trial judge provided the State with a deadline for filing a formal recusal motion and set a briefing schedule.
>
> The State never filed a formal motion for recusal. Instead, the State's lead deputy prosecutor assigned to this case filed a notice of abandonment, disavowing the recusal request. Mr. Blizzard, in turn, filed a motion to dismiss under CrR 8.3(b) for prosecutorial misconduct based on the letter. The trial court denied Mr. Blizzard's motion and continued to hear the case.

*State v. Blizzard*, 195 Wn. App. 717, 723-24, 381 P.3d 1241 (2016) (citations omitted),

*review denied*, 187 Wn.2d 1012, 388 P.3d 485 (2017).

Mr. Gomez-Monges filed his own motion to dismiss the charges against him under

CrR 8.3(b) based on the prosecutor's letter, which he, too, characterized as prosecutorial

misconduct. The trial court heard argument of dismissal motions in all four pending

prosecutions at the same time and denied all of them. It proceeded to preside at the two

trials that eventually took place. Ms. Mendez and Ms. Taylor were offered plea deals and

turned State's evidence.

At Mr. Gomez-Monges's trial, Ms. Mendez testified that in February 2013 she

learned from Ms. Taylor that Mr. Blizzard was willing to pay $10,000 to have a man

killed, shared the information with Mr. Gomez-Monges, and the two of them approached

Mr. Blizzard about the offer. Through Ms. Mendez, who acted as translator (Mr. Gomez-

Monges's primary language is Spanish[4]), Mr. Gomez-Monges told Mr. Blizzard "that he was going to do it." RP at 2058.

A couple of weeks before the assault, Mr. Blizzard suggested that Ms. Mendez and Mr. Gomez-Monges carry out the crime by pretending to be in the market to buy a home and arranging to have Mr. Holbrook show them some properties. Ms. Mendez testified that as May 25 approached, Mr. Gomez-Monges told her "[t]o go ahead and set up the appointment." RP at 2066.

On May 25, Mr. Gomez-Monges borrowed his mother's car and drove Ms. Mendez and her three children to a house in Tieton where Ms. Mendez had arranged for the couple to meet Mr. Holbrook. They met Mr. Holbrook at the house around noon. He showed them that house and another house nearby. According to Ms. Mendez, the children waited in the car both times as she and Mr. Gomez-Monges looked at the homes.

Ms. Mendez testified that during the tour of the second home, "[o]ut of the corner of my eye I see Luis getting ready to hit Holbrook." RP at 2078. She saw Mr. Gomez-Monges's left hand pull back, saw him starting to swing at Mr. Holbrook, and then she walked out of the room. She testified that, "As I walk I see him—I felt Holbrook hit the floor." RP at 2079. After that, she turned around and saw Mr. Gomez-Monges lean over Mr. Holbrook and hit him. She described Mr. Gomez-Monges as hitting Mr. Holbrook

---

[4] According to Ms. Mendez, Mr. Gomez-Monges understands English and can speak it some, but struggles with conversation.

"on his head," with his fist, "four, five times." RP at 2081. When Ms. Mendez saw blood flowing from underneath Mr. Holbrook, she walked outside. She said she "didn't want to see more." RP at 2083. She waited outside, and Mr. Gomez-Monges came out of the house a few minutes later. They took Mr. Holbrook's cellphone, which they broke and discarded. At Mr. Gomez-Monges's suggestion, she sent a text message to Mr. Blizzard to let him know the job was done. She and Mr. Gomez-Monges then drove back to Yakima together.

Two days after the assault, on May 27, Ms. Mendez received $12,000 from Mr. Blizzard that she claimed to have given to Mr. Gomez-Monges the same afternoon. By that time, Detective Perrault had contacted her to ask about the call placed from her phone to Mr. Holbrook. She agreed that the detective could pick her up for questioning and told Mr. Gomez-Monges that it would not be a good idea for him to be present when the detective arrived. According to her, Mr. Gomez-Monges said not to worry because she "didn't do anything." RP at 2147.

Mr. Gomez-Monges testified at trial and accused Ms. Mendez of the murder. He claimed to have known nothing about a plan to kill someone for money. According to Mr. Gomez-Monges, he had cleaned up and repaired a trailer that his mother wanted to sell, and on the day Mr. Holbrook was assaulted, Ms. Mendez told him they were going to meet with a man who was interested in the trailer. At Ms. Mendez's direction, Mr. Gomez-Monges drove to the house in Tieton where they met Mr. Holbrook, whom they

6

followed to a second home. At the second home, Mr. Gomez-Monges claimed Ms. Mendez sent him outside to roll down the car windows for the waiting children, and as he was walking back to the house, he heard a sound "like when you break a coconut with something." RP (Oct. 9, 2014) at 154. Rushing in, he encountered Ms. Mendez "screaming and . . . standing there and the man was laying between her legs and she was hitting him, it was with a rock, like a big rock." RP (Oct. 9, 2014) at 155. He claims to have pulled her off of Mr. Holbrook and taken the rock. She refused to tell him what was going on and insisted that they leave. He testified that Ms. Mendez threw the rock and Mr. Holbrook's cell phone out the car window as they drove back to Yakima and that she never gave him $12,000.

Four medical experts testified at trial: Robert Padilla, M.D., the emergency room physician who attended to Mr. Holbrook at Yakima Valley Memorial Hospital the night of the assault; Ronald Pauldine, M.D., an anesthesiologist intensivist who attended to Mr. Holbrook after he was transferred to Harborview Medical Center; Jeffrey Reynolds, M.D., the forensic pathologist who performed the autopsy of Mr. Holbrook; and Carl Wigren, M.D., a forensic pathologist engaged by the defense. Mr. Holbrook had remained in a chronic vegetative state until passing away on January 26, 2014, so the autopsy was performed 8 months after the assault.

The two pathologists agreed that the cause of Mr. Holbrook's death was severe blunt force trauma to his head and that he had three injuries to his skull. They agreed that

the injuries were not caused by blows with a fist. Dr. Reynolds testified that blows with a fist "would leave a different kind of tear in the skin," and given the force with which the injuries were delivered, such a blow "would fracture every bone in your hand." RP at 2338. He surmised that the injury was inflicted by something with a slightly rounded edge. He testified that someone stomping on the head was a "possible" cause of the injuries. *Id.*

The defense expert, Dr. Carl Wigren, did not dispute that stomping on Mr. Holbrook's head was consistent with the severity of the blows if it had been done by someone wearing a "really hard-edged sole," but testified that it would ordinarily leave a patterned abrasion and "a surgeon would probably remark on that and a forensic nurse examiner would probably photograph that." RP at 2370-71. When cross-examined, he agreed it was "possible" that a victim's head could be stomped on without leaving a visible patterned abrasion. RP at 2380.

Mr. Holbrook had also sustained a large cut across the front part of his neck that extended into his larynx but had not injured his carotid arteries. A box cutter with reddish brown stains on its blade was found in the trunk of the car Mr. Gomez-Monges drove on the day of the assault, but there was insufficient DNA[5] evidence on the handle or blade to compare it to DNA samples from Mr. Gomez-Monges, Ms. Mendez and Mr.

---

[5] Deoxyribonucleic acid.

Holbrook.  The box cutter was the only item found by law enforcement that might have been used as a weapon in the assault.

Dr. Wigren, when questioned whether the box cutter could have caused the neck injury, expressed the view that if the blade had been extended far enough to account for the depth of the wound, the blade would have broken off.  The three other medical experts expressed their view that a box cutter or utility knife could have caused the injury, however.

The jury found Mr. Gomez-Monges guilty of first degree murder but answered "no" to three special verdicts, including one asking if Mr. Gomez-Monges had been armed with a deadly weapon at the time of the assault.[6]  Clerk's Papers (CP) at 1864. The trial court sentenced him to 320 months' confinement and imposed $20,860.50 in LFOs, $19,210.50 of which was restitution.  After briefly discussing Mr. Gomez-Monges's ability to pay the court imposed fines of $600.00 for his court appointed attorney and $500.00 for the cost of incarceration.  Mr. Gomez-Monges did not object.

Mr. Gomez-Monges appeals.

---

[6] The others asked whether the defendant manifested deliberate cruelty to the victim or knew Mr. Holbrook was particularly vulnerable.

ANALYSIS

I.      SUBSTANTIAL EVIDENCE SUPPORTS THE CONVICTION

Mr. Gomez-Monges concedes that "[t]he State provided evidence *ad nauseum* of a plan by Mr. Blizzard to kill Mr. Holbrook" and had "proved that Mr. Gomez-Monges had knowledge of th[e] plan[ and] was present when Mr. Holbrook was killed." Br. of Appellant at 15. But emphasizing the jurors' special verdict finding that Mr. Gomez-Monges was not armed with a deadly weapon and the pathologists' agreement that the head injuries could not have been inflicted by blows with a fist, Mr. Gomez-Monges argues that "there was no evidence that Mr. Gomez-Monges killed Mr. Holbrook." *Id.*

A defendant's challenge to the sufficiency of the evidence requires us to view the evidence in the light most favorable to the State and determine "whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt." *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Substantial evidence means evidence in the record of a sufficient quantity to persuade a fair-minded, rational person of the truth of the finding. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Mr. Gomez-Monges is wrong when he argues that the State failed to prove its case because it presented no evidence of a weapon used to strike the head blows. When

conducting substantial evidence review, "circumstantial evidence is not to be considered any less reliable than direct evidence." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). In an analogous case, *State v. Slaughter*, 70 Wn.2d 935, 425 P.2d 876 (1967), our Supreme Court affirmed a conviction for assault with a deadly weapon even though no deadly weapon was seen by the victim or by the witness to the immediate aftermath of the crime, and no deadly weapon was ever found. As the court explained,

> In addition to the circumstantial evidence, we have the testimony of Mr. McFerrian that defendant struck him, knocked him down, and, although he did not see the weapon which produced them, the blows inflicted the wounds which required suturing and medical care. The sight of a blade in defendant's hand would have added little to the direct evidence that he struck his victim, knocked him down, and in so doing inflicted two cutting wounds. Viewed in the light of the argument between Mrs. Ruiz and defendant, followed immediately with her leaving the two men alone in the hallway, and the complete absence of any other evidence explaining or implying that the wounds could have been inflicted by another person, or by accident, we have proof of circumstances rivaling in persuasiveness direct evidence that the victim saw a weapon in defendant's hand when the blow was struck.

*Id.* at 938.

He overstates Dr. Wigren's refutation of the possibility that Mr. Gomez-Monges produced the injuries by stomping on Mr. Holbrook's head, a possibility consistent with Ms. Mendez's testimony that when she walked outside Mr. Gomez-Monges was standing over Mr. Holbrook, who was on the floor. We disagree with Mr. Gomez-Monges's argument that because only the pathologists had the benefit of the close examination that can be done post-mortem, the jurors should have accepted their opinions over that of a

11

treating physician, Dr. Padilla, who testified that the head injuries could "[p]erhaps" have been inflicted by "a very hard [blow] with a fist, elbow, [or] knee." RP at 1458. (He believed another object was more likely.) As the jurors were instructed, they were "not . . . required to accept" the opinion of any expert witness. CP at 1845 (Jury Instruction 7).

We disagree that the jurors' answer to the deadly weapon special verdict belies a finding of guilt beyond a reasonable doubt. Mr. Gomez-Monges was charged with premeditated first degree murder, not murder with a deadly weapon. The deadly weapon instruction was relevant to only the aggravating circumstance charged by the State. Jurors could have concluded that no deadly weapon was used or might have answered "no" because they inferred that one was used but were reluctant to make the finding absent direct evidence. In other words, the special verdict might not be inconsistent or it might be; either way, it is not a basis for rejecting a verdict that is otherwise supported by substantial evidence. *State v. Goins*, 151 Wn.2d 728, 734, 92 P.3d 181 (2004). "Juries return inconsistent verdicts for various reasons, including mistake, compromise, and lenity." *Id.* at 733 (citing *Dunn v. United States*, 284 U.S. 390, 393-94, 52 S. Ct. 189, 76 L. Ed. 356 (1932)); *see also State v. Holmes*, 106 Wn. App. 775, 780, 24 P.3d 1118 (2001) (holding that a jury could reasonably conclude that a utility knife was not likely to or to easily produce death).

Finally, Mr. Gomez-Monges was charged as an accomplice, and jurors, or some of them, might have believed his testimony that Ms. Mendez inflicted the fatal injuries with a rock but disbelieved his claim that assistance he provided before and after the crime was without the intent to assist.[7] "[A] jury is not required to determine which participant acted as a principal and which participant acted as an accomplice." *In re Pers. Restraint of Hegney*, 138 Wn. App. 511, 524, 158 P.3d 1193 (2007).

The evidence was sufficient.

II. THE TRIAL COURT DID NOT ERR IN DENYING MR. GOMEZ-MONGES'S MOTION TO DISMISS THE CHARGE AGAINST HIM

Mr. Gomez-Monges next argues that the Yakima County prosecutor's letter complaining about the trial judge and asking that she be removed from the case violated separation of powers and constituted outrageous government misconduct, violating Mr. Gomez-Monges's rights to due process and a fair tribunal. The same arguments were made in Mr. Blizzard's earlier appeal and were rejected. *Blizzard*, 195 Wn. App. at 724-29. Mr. Gomez-Monges has identified no difference between the letter's impact on Mr. Blizzard's trial and his own; instead, he implies that we should reconsider the decision in *Blizzard*. We stand by the reasoning of *Blizzard*. The trial court did not err in denying the motion to dismiss the charge.

---

[7] Jurors inquired during their deliberations as to whether Mr. Gomez-Monges was the perpetrator or an accomplice.

No. 32919-4-III
*State v. Gomez-Monges*

III.    IMPOSITION OF LFOS WITHOUT A SUFFICIENT *BLAZINA*[8] INQUIRY

Finally, Mr. Gomez-Monges argues that the trial court erred when it imposed discretionary LFOs without conducting the individualized inquiry into his ability to pay required by RCW 10.01.160(3) and *Blazina*.

In response, the State informs the court that "in the interest of judicial economy, the State agrees to waive both discretionary costs if the Court allows the issue to be considered for the first time on appeal." Br. of Resp't at 37. A majority of the panel would consider the issue for the first time on appeal, so we accept the State's waiver of discretionary costs. We remand with directions to strike them.

Affirmed and remanded with directions to strike both discretionary LFOs.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____          _____
Lawrence-Berrey, C.J.                              Fearing, J.

---

[8] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

14