**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>       v.<br><br>RICHARD NELSON,<br><br>               Appellant. | No. 84411-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — Richard Nelson appeals his conviction for second degree intentional murder with a firearm enhancement. Nelson argues (1) his right to a speedy trial was violated, (2) he was constructively deprived of his right to counsel, (3) multiple charges for the same conduct violated his right to due process, (4) there was insufficient evidence to support a firearm enhancement, (5) the trial court erred when it failed to grant his motion to suppress the results of a search warrant, and (6) his legal financial obligations (LFOs) should be stricken. We remand to strike the Victim Penalty Assessment (VPA) and DNA[1] collection fee from Nelson's judgment and sentence. We otherwise affirm.

---

[1] Deoxyribonucleic acid.

I

A

About 4:00 a.m. on October 25, 2017, an employee arriving for work found the body of C.H. lying on the sidewalk near the main entrance at St. Francis Hospital in Federal Way. The employee heard a car speeding away and caught a glimpse of a vehicle leaving the parking lot. The hospital's main entrance is staffed only during business hours and was dark at the time of the discovery.

C.H. was unresponsive and not breathing. Medical staff noticed blood on C.H.'s ears, nose, throat, clothes, and on the ground near her body. Attempts were made to revive C.H. but she never regained consciousness and was declared deceased. The cause of C.H.'s death was a single gunshot to the back of her head. The Federal Way Police Department investigated the death.

The same morning, C.H.'s car was found by a resident of a mobile home park. The park manager reported the discovery to the police because she saw blood inside. The responding police officer could visibly see a large concentration of blood across the front passenger seat and window.

A search of the car turned up a fired cartridge case from a 9 mm handgun, and C.H.'s purse with her ID and debit card inside. C.H.'s cellphone was not recovered from the car. A fingerprint from the exterior front passenger door of the car was matched to Nelson. Nelson's DNA was also present on the driver's side door handle.[2] Nelson and C.H. had dated for about a year, breaking up in September 2017. C.H. told friends she

---

[2] There was also a likelihood that Nelson's DNA contributed to a sample found on C.H.'s underwear.

broke up with Nelson because she was not happy in the relationship. Three days before her death, on October 22, C.H. met with Nelson at a bar in Renton. Nelson asserted this was the last time he saw C.H.

During the early hours of October 25, C.H. told her mother she was going to visit a friend and would be right back. C.H. did not return. Several hours later, the police arrived and notified C.H.'s mother about her death.

Following her death, C.H.'s friend accessed her e-mail account and discovered a conversation from the early morning hours of October 25. The discovery was reported to Detective Richard Kim.

The conversation was between a "David Dickmeher" and C.H.[3] The messages span between 12:18 a.m. and 3:39 a.m. on October 25, 2017. Dickmeher asked to use C.H.'s services and arranged for her to come to him. Dickmeher gave a specific address and apartment number. When C.H. arrived, these messages were exchanged:

> C.H. at 3:29 a.m.: I knocked, totally scary, what's up.
> C.H. at 3:31 a.m.: I'm leaving. This was a waste.
> Dickmeher at 3:31 a.m.: My fault. Come back to door. Was in bathroom.
> C.H. at 3:32 a.m.: I'm scared now. Come out.
> Dickmeher at 3:35 a.m.: Come back. I didn't hear you knock. Bathroom in back.
> C.H. at 3:35 a.m.: Yes or no.
> Dickmeher at 3:35 a.m.: You by yourself?
> C.H. at 3:36 a.m.: Yes. That's why I'm terrified. Lol. And you're in back and no lights on in house.
> Dickmeher at 3:36 a.m.: I'll come out if so.
> C.H. at 3:37 a.m.: Yes, please. I'm driving back down.
> Dickmeher at 3:38 a.m.: Sorry
> C.H. at 3:38 a.m.: I don't see you.
> Dickmeher at 3:39 a.m.: I'll meet you at door.

---

[3] C.H. used the pseudonym "Chrissy Collins" when she engaged in periodic sex work.

Investigators performed several searches for the name "David Dickmeher" and determined it was likely a pseudonym. Google records showed that the account was created in the hours before the murder. Nelson was the subscriber of the phone number listed as the contact number for the Google account, and his ex-wife confirmed that Nelson used the phone number. Service for this phone number was terminated on October 26, 2017—the day after the murder.

Nelson had lived at the apartment complex that "Dickmeher" had directed C.H. to. The mobile home park where C.H.'s car was found was next door and was visible from Nelson's former apartment.

When investigators first spoke with Nelson, he told them that on October 25 he started his work shift at 5:00 a.m. Nelson worked for Allied Universal providing private security services at Stabbert Marine, a repair shop in Ballard. Nelson's normal work shift was from 5:00 a.m. to 1:00 p.m. Allied used an automated phone system to log attendance. Nelson regularly used this system, calling from his cell phone. On October 25, Nelson did not call to log his arrival. Because he was the first to arrive at Stabbert Marine, no one could corroborate whether Nelson actually showed up at 5:00 a.m. that day. Cell phone records showed that Nelson sent a text from the vicinity of Stabbert Marine at 5:42 a.m.[4]

---

[4] Detectives drove several routes to determine whether Nelson could have committed the murder and made it to work on time. Detectives started at St. Francis Hospital at 3:50 a.m., the approximate time C.H.'s body was dumped, and drove to the mobile home park where C.H.'s car was found, which took 13 minutes. Detectives then drove to Stabbert Marine and arrived at 4:36 a.m., a total travel time of 46 minutes.

B

Nelson was charged with one count of murder in the second degree. The State later amended the information to include two counts: murder in the first degree (count 1) contrary to RCW 9A.32.030(1)(a); and murder in the second degree (count 2) contrary to RCW 9A.32.050(1)(a), intentional murder, and (b), felony murder. The State acknowledged that counts 1 and 2 would merge in the event of multiple convictions.

After the State rested, defense requested a manslaughter instruction as a lesser included offense to intentional murder. The State proposed a second amended information that separated count 2 into two separate counts: count 2, murder in the second degree, intentional murder; count 3, murder in the second degree, felony murder. This was because there is no lesser offense for second degree felony murder. Defense counsel did not object, conceding that these were the exact charges Nelson was already facing and it would make it easier for the jury to consider the manslaughter lesser on the two charges they apply to.

The jury was unable to reach a verdict on count 1, murder in the first degree. But the jury returned guilty verdicts on count 2, murder in the second degree, intentional murder, and count 3, murder in the second degree, felony murder. The jury also returned a guilty verdict on manslaughter in the first degree. By special verdicts, the jury found that Nelson was armed with a firearm at the time of the crime and that Nelson and C.H. were family or household members.

Nelson was sentenced only on count 2, murder in the second degree, intentional murder. Nelson received a sentence within the standard range: 220 months on count 2 and 60 months for the firearm enhancement.

Nelson appeals.

II

Nelson argues that the State violated his constitutional right to a speedy trial. We disagree.

A

Nelson was arraigned on June 1, 2020, and his jury trial was initially scheduled for October 20, 2020. At his second appearance, Nelson asserted his speedy trial rights while his counsel explained, "defense counsel actually does not expect that we'll be prepared at that point and time . . . at this point we've received 700 pages of discovery but they haven't been released to us yet because they're still undergoing conflict checks." The State responded, "I imagine this case is going to take a significant amount of preparation for counsel. It is a lengthy investigation with a lot of digital discovery."

Between October 2020 to October 2021, defense counsel moved to continue the trial six times because of the need for more time to investigate the case, consult an expert, conduct witness interviews, and because of prescheduled leaves of absence. Nelson objected each time.

On October 8, 2021, the parties confirmed they were ready for trial but notified the court that the expected trial length would come close to defense counsel's prescheduled December vacation. Defense counsel indicated a preference to start trial and seek a recess if necessary.

Between October 20, 2021 and November 22, 2021, the court administratively continued the trial nine times because of the prosecutor being in trial.

-6-

On November 29, 2021, defense counsel moved to continue the trial due to her prescheduled December vacation. Nelson objected.

Between December 22, 2021 and May 6, 2022, the court administratively continued the trial 17 times. The reasons given included: prosecutor in trial, trial scheduled on a non-trial calendar day, "E.O. 34," "E.O. 35," defense counsel in trial, and both prosecutor and defense counsel in trial.[5]

On May 10, 2022, the State moved to continue the trial because the lead investigator, Detective Kim, had undergone surgery and had not been medically cleared to return to work. Nelson objected. The trial court found "the lead detective's medical unavailability is a good cause for the continuance." The State moved twice more to continue the trial because of Detective Kim's medical unavailability and based on Detective Kim contracting COVID-19. Nelson objected to both.

The court administratively continued the trial one final time, from June 21 to June 22, 2022, due to judicial unavailability. Nelson's trial began on June 22, 2022.

B

This court reviews alleged violations of the right to speedy trial de novo. State v. Ollivier, 178 Wn.2d 813, 826, 312 P.3d 1 (2013). The right to a speedy trial is protected by the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution. Ollivier, 178 Wn.2d at 826. The two are coextensive. Ollivier, 178 Wn.2d at 826. If a defendant's right to a speedy trial is violated, the

---

[5] "E.O. 34" refers to King County Superior Court Emergency Order 34 which suspended in-person criminal trials from December 28, 2021 through January 14, 2022 in response to the ongoing public health emergency and the emergence of the Omicron Variant of COVID-19. Similarly, "E.O. 35" suspended in-person criminal trials from January 12, 2022 through February 11, 2022. The orders can be found at: https://perma.cc/2FCG-H99B (order 34) and https://perma.cc/6H8Q-ERVE (order 35).

remedy is dismissal of the charges with prejudice. State v. Iniguez, 167 Wn.2d 273, 282, 217 P.3d 768 (2009).

Washington courts apply the balancing test set out in Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), to determine whether a constitutional violation has occurred. Ollivier, 178 Wn.2d at 827. The test is fact-specific and "dependent upon the peculiar circumstances of the case." Barker, 407 U.S. at 530-31. The conduct of the prosecution and the defendant are weighed. Ollivier, 178 Wn.2d at 827. We consider nonexclusive factors including the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defendant. Ollivier, 178 Wn.2d at 827. "[T]he defendant ordinarily must establish actual prejudice to the ability to prepare a defense." Ollivier, 178 Wn.2d at 826.

Nelson was arraigned on June 1, 2020, and his trial began on June 22, 2022. This period of 25 months is enough to trigger a speedy trial analysis under Barker. Ollivier, 178 Wn.2d at 827-28; see Iniguez, 167 Wn.2d at 292 (finding eight-month delay presumptively prejudicial).

1

The first Barker factor—length of delay—"focuses on the extent to which the delay stretches past the bare minimum needed to trigger the Barker analysis." Iniguez, 167 Wn.2d at 283-84. Reviewing federal cases, the Ollivier court noted that federal courts of appeal found that delays between 21 months and 58 months were not exceptionally long, "particularly when the delay was attributable to the defense." 178 Wn.2d at 828.

We consider whether the length of the delay is "highly disproportionate to the complexity of the issues and counsel's need for preparation." Ollivier, 178 Wn.2d at 830.

The State contends that this was a complex case:

> In this case, there are over 2000 pages of paper discovery, 16 extensive search warrants and affidavits, voluminous phone records from such entities as Verizon, T-Mobile, and Century-Link, social media records from Google and Facebook, jail calls, audio recordings of numerous interviews, photos, King County Medical Examiner Records, Franciscan Health Medical Records, and surveillance video. This case also involves DNA reports and fingerprint materials.

Defense counsel conducted about 70 witness interviews.

We agree with the State. This case was complex. Nelson was charged with murder in the first degree and there was voluminous and complex discovery based on his use of a pseudonym to commit the crime. We conclude the length of the delay weighs against finding a violation of Nelson's right to a speedy trial.

2

The second Barker factor—the reason for the delay—is the main focus of our inquiry. Ollivier, 178 Wn.2d at 831. "'Pretrial delay is often both inevitable and wholly justifiable.'" Ollivier, 178 Wn.2d at 831 (quoting Doggett v. United States, 505 U.S. 647, 656, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). "When the delay is due to trial preparation needs, as in this case, the first and second factors are closely related." Ollivier, 178 Wn.2d at 831.

Delay caused by defense counsel is chargeable to the defendant. Ollivier, 178 Wn.2d at 832.[6] Delay attributed to the State is only weighted heavily if it was intentional or designed to frustrate the defense. Ollivier, 178 Wn.2d at 832. Delay because of institutional causes, such as overcrowded courts, is still weighted against the government but to a lesser extent, and if the government has a valid reason, that reason may justify a reasonable delay. Ollivier, 178 Wn.2d at 832.

Defense counsel moved to continue the trial six times between October 2020 to October 2021 to investigate the case. And, again on November 29, 2021, due to a prescheduled vacation. This is chargeable to Nelson despite his objections.

The State sought three continuances because of the medical unavailability of the lead detective. The unavailability of a primary witness is a "well accepted reason[] to continue a trial." State v. Lackey, 153 Wn. App. 791, 801, 223 P.3d 1215 (2009). Because this delay was justifiable, it does not count against the State.

The remaining continuances were granted administratively by the court. By October 2021, it was well known that trial courts across Western Washington were experiencing significant delays because of the closures mandated by the COVID-19 pandemic.[7] It is indisputable that these delays resulted from the COVID-19 pandemic. First, the backlog created by the initial court closures in 2020 that suspended criminal

---

[6] Nelson points to Vermont v. Brillon, 556 U.S. 81, 94, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009), which explained that this general rule is not absolute, "[d]elay resulting from a systemic breakdown in the public defender system could be charged to the State." (Emphasis added.) As discussed in section III of this opinion, Nelson failed to properly raise government mismanagement in the trial court and the record before us lacks sufficient facts of a systemic breakdown in the public defense system.

[7] State v. Ferguson, 25 Wn. App. 2d 727, 731-33, 524 P.3d 1080 (2023), outlines the background of COVID-19 and court operations. Our Supreme Court suspended criminal jury trials several times, from March 20 until July 6, 2020. Ferguson, 25 Wn. App. 2d at 733.

trials for several months as the court explained to Nelson on June 18, 2021: "[t]hings have slowed down significantly because of the pandemic . . . [w]e haven't even had trials until recently." Second, there were two suspensions of criminal trials during winter 2021 to 2022. Third, because of the backlog, both defense counsel and the State had multiple complex cases go to trial during the same time, resulting in significant scheduling difficulties.[8] These administrative continuances were justifiable, owing to a global pandemic.

Nelson makes no showing that the continuances ordered were intentional or deliberately done to frustrate the defense. Thus, we conclude the reason for the delay weighs against finding a violation of Nelson's right to a speedy trial.

3

The third Barker factor requires us to examine "'the defendant's assertion of or failure to assert'" their constitutional speedy trial rights. Ollivier, 178 Wn.2d at 837 (quoting Barker, 407 U.S. at 528). When a defendant asserts their speedy trial rights but their attorney seeks continuances to prepare for trial, this factor is neutral. Ollivier, 178 Wn.2d at 839-40.

Nelson repeatedly asserted his right to a speedy trial and vociferously objected to continuances. But Nelson also objected to even the earliest continuances when his counsel would not have been remotely ready for trial. Because most of the continuances—excluding the administrative continuances resulting from COVID-19—

---

[8] In the context of CrR 3.3, courts have consistently held that the unavailability of counsel may constitute unforeseen or unavoidable circumstances that warrant a trial extension. See State v. Carson, 128 Wn.2d 805, 814 n.45, 912 P.2d 1016 (1996), abrogated on other grounds by State v. Walker, 199 Wn.2d 796, 513 P.3d 111 (2022).

occurred to allow Nelson's attorney to prepare for trial, the third Barker factor weighs neither for nor against finding a violation of Nelson's right to a speedy trial.

4

The fourth Barker factor requires us to determine "whether the delay has prejudiced the defendant." State v. Ross, 8 Wn. App. 2d 928, 955, 441 P.3d 1254 (2019). Generally, defendants must establish actual prejudice before courts will find a constitutional violation but we presume prejudice when the State's negligence causes the delay and the delay itself is extraordinary. Ollivier, 178 Wn.2d at 840; Ross, 8 Wn. App. 2d at 956.

A showing of actual prejudice "'may consist of (1) oppressive pretrial incarceration, (2) anxiety and concern of the accused, and (3) the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence.'" Ollivier, 178 Wn.2d at 840 (alterations in original) (quoting Doggett, 505 U.S. at 654.) "[A] defendant must offer these or other particularized showings of prejudice when the delay is not due to bad faith on the government's part and the delay is not sufficiently long for a presumption of prejudice to arise." Ollivier, 178 Wn.2d at 840. The latter is "to be distinguished from the threshold presumption of prejudice that triggers the Barker analysis." Ollivier, 178 Wn.2d at 840 n.10.

Nelson has offered no specific allegation of prejudice, except for reciting the rule stated above. Instead, Nelson asserts only that the delay was "presumptively prejudicial." But prejudice is only presumed in the case of "extraordinary delay," defined as "at least five years." Ollivier, 178 Wn.2d at 842. And when the State's conduct is more egregious than mere negligence. Ollivier, 178 Wn.2d at 842. Here, the delay was

not caused by the State's negligence and the delay itself was not extraordinary.  We conclude this factor weighs against finding a violation of Nelson's right to a speedy trial.

Nelson has not established that his right to a speedy trial was violated.  The length of the delay was commensurate with the complexity of the case, Nelson was responsible for a majority of the delay, excluding the administrative continuances resulting from COVID-19, and Nelson has not shown that the passage of time prejudiced his case.  We conclude that Nelson's right to a speedy trial was not violated.

III

Nelson asserts he was constructively denied access to counsel because his attorney "did not meet the basic constitutional requirement of investigating his case for almost two years because of systemic shortages of indigent counsel."  Nelson does not claim that he received ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Instead, he argues that the pretrial delay in his case was a constructive absence of counsel under United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).  We disagree.

Cronic discussed three circumstances where deficient performance of counsel constitutes structural error, and thus warrants reversal without conducting a full Strickland analysis.[9]  Cronic, 466 U.S. at 658.

The first situation in which a presumption of prejudice is warranted is when the defendant has been completely denied counsel at a critical stage of the proceedings.  Cronic, 466 U.S. at 659.  The second situation arises when the circumstances are such

---

[9] Strickland applies to claims of ineffective assistance of counsel and established a two-part test: First, the defendant must show that counsel's performance was deficient, and second, the defendant must show that the deficient performance prejudiced the defendant.  466 U.S. at 687.

that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance" is minimal. Cronic, 466 U.S. at 659-60. As an example of this situation, the Supreme Court noted Powell v. Alabama, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932), where the trial court first appointed the entire Alabama bar as counsel for eight defendants charged with a capital offense, then, on the day of trial, six days after arraignment, instead appointed an attorney from Tennessee who was not licensed to practice law in Alabama. Cronic, 466 U.S. at 660. The third situation arises when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." Cronic, 466 U.S. at 659. "[T]he attorney's failure must be complete." Bell v. Cone, 535 U.S. 685, 696-07, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

"[O]nly when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." Cronic, 466 U.S. at 662. In State v. McCabe, 25 Wn. App. 2d 456, 466, 523 P.3d 271 (2023), this court explained, "allegations of poor performance, no matter how poor, cannot form the basis of a Cronic claim. . . . For such a claim to be presented, counsel must have been absent or entirely nonparticipatory."

Nelson does not argue that he was denied counsel at a critical stage, that the circumstances below made it impossible for any competent attorney to effectively represent him, or that his counsel failed to meaningfully test the prosecution's case. Nor does Nelson assert poor performance by his counsel and there is no evidence that counsel was absent or entirely nonparticipatory. McCabe, 25 Wn. App. 2d at 466.

Instead, Nelson cites State v. Sherman, 59 Wn. App. 763, 801 P.2d 274 (1990), and argues that defense counsel's delay in bringing his case to trial because of

-14-

inadequate resources to prepare "created a Hobson's choice between a timely trial and prepared counsel."[10]  But Nelson cites no authority that defense counsel taking time to investigate and prepare a case for trial constitutes constructive deprivation of counsel. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

Nelson is also factually incorrect.  Nelson asserts that defense counsel was not ready for trial for almost two years.  But the record shows, and Nelson's brief acknowledges, that defense counsel only sought continuances to investigate the case for about 14 months.  Both the State and defense confirmed that they were ready for trial on October 8, 2021.  As discussed above, this was a first degree murder case, with significant technical evidence for defense counsel to sift through.  Defense counsel retained and consulted a digital forensics expert and conducted about 70 witness interviews.  Significantly, defense counsel succeeded in obtaining an acquittal for Nelson on the most serious charge—first degree murder.

Nelson cites statements made by defense counsel about trial continuances as evidence of systemic failure resulting in their inability to prepare for trial including, "[i]t's something we have to do on a regular basis which is unfortunate, but we also—all of us

---

[10] In Sherman, the trial court dismissed the prosecution under CrR 8.3(b) because of governmental mismanagement that included significant discovery violations by the prosecutor.  59 Wn. App. at 766-68.  On appeal, the State argued that the defendant should have sought a continuance to allow time for the State to produce records.  Sherman, 59 Wn. App. at 769.  The appellate court stated, "in circumstances such as these, we do not believe a defendant should be asked to choose between two constitutional rights in order to accommodate the State's lack of diligence," referring to the defendant either having to sacrifice the right to a speedy trial or the right to be represented by counsel who had sufficient opportunity to prepare a defense.  Sherman, 59 Wn. App. at 769-70.  As discussed below, Nelson did not move to dismiss the prosecution against him under CrR 8.3(b).  And Nelson has not alleged that the State lacked diligence.

have a caseload that requires attention on every case all of the time." And, "I am frustrated with the delays that occur in cases but it's also a lot of systemic factors that we can't necessarily control."

These statements are Nelson's only purported evidence of systemic factors, including heavy caseloads, leading to delays in the public defense system. Nelson has presented no evidence to this court of how King County's Department of Public Defense (DPD) was functioning at the time.

Finally, in his reply brief, Nelson asserts that other reasons for the delay, including counsel's unavailability because of trying other cases or taking vacation is part of the problem. He asserts "there were not enough lawyers assigned to try these cases in a reasonable time period." But, again, Nelson cites no authority that supports the proposition that delays within the public defense system amount to a constructive denial of counsel under Cronic.

Nelson has thus failed to assert a cognizable claim of constructive deprivation of counsel.

Nelson also argues "the systemic breakdown in the King County public defender system's ability to provide counsel who was prepared to try Mr. Nelson's case for two years constitutes governmental mismanagement." CrR 8.3(b) permits the trial court to dismiss a criminal prosecution under certain circumstances, including government misconduct. CrR 8.3 applies to governmental misconduct at any level, not just by the prosecuting attorney's office. State v. Jieta, 12 Wn. App. 2d 227, 232, 457 P.3d 1209 (2020).

Nelson did not move to dismiss his case under CrR 8.3(b) below and so failed to preserve this issue for appeal. An appellate court "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a); Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005). We consider this argument as waived.[11]

IV

Nelson argues that the decision to charge him with multiple counts of murder for the same conduct violated his due process rights under the Sixth and Fourteenth Amendments. The State argues these were alternative charges. We agree with the State.

In the context of criminal trials, due process "establishes the minimal requirements for a fair hearing." State v. Blizzard, 195 Wn. App. 717, 725, 381 P.3d 1241 (2016). The state and federal constitutions provide identical due process protections. State v. Frank, 112 Wn. App. 515, 521, 49 P.3d 954 (2002).

The government has "broad discretion to conduct criminal prosecutions, including the power to select the charges to be brought in a particular case." Ball v. United States, 470 U.S. 856, 859, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985); see also State v. Lee, 69 Wn. App. 31, 36, 847 P.2d 25 (1993) ("Prosecutors have broad discretion with respect to charging decisions."). Individual charging decisions depend on many factors, including the prosecutor's analysis of the strength of the evidence, the possible defenses, and the public interest to be served by the prosecution. State v. Judge, 100

---

[11] In a statement of additional authorities submitted after oral argument, Nelson cites several news articles on the King County DPD and the State Office of Public Defense and asks this court to take judicial notice of these types of "social facts." Nelson had a chance to raise these arguments in a CrR 8.3 motion in the trial court, which would have led to factual findings, and failed to do so.

Wn.2d 706, 713, 675 P.2d 219 (1984); RCW 9.94A.440.  "A defendant's ultimate protection against overcharging lies in the requirement that the State prove all elements of the charged crime beyond a reasonable doubt."  Lee, 69 Wn. App. at 37-38.

Nelson asserts that the prosecutor overcharged him as the evidence presented only established lesser degrees of homicide than murder in the first degree.  A person is guilty of murder in the first degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person.  RCW 9A.32.030(1)(a).  Premeditation requires "more than a moment in point of time."  RCW 9A.32.020(1).  "The State must show 'the deliberate formation of and reflection upon the intent to take a human life,'" which "'involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'"  State v. Hummel, 196 Wn. App. 329, 354, 383 P.3d 592 (2016) (quoting State v. Hoffman, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991)).  The sufficiency of the evidence to support premeditation has included evidence of "motive, acquisition of a weapon, and planning directly related to the killing."  State v. Bingham, 40 Wn. App. 553, 557, 699 P.2d 262 (1985).  The sufficiency standard considers the evidence in the light most favorable to the State.  State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

While the jury did not find Nelson guilty of murder in the first degree, this does not mean that Nelson was overcharged.  The jury did find him guilty of intentional murder in the second degree.  Evidence of "planning directly related to the killing" included evidence of the creation of the "Dickmeher" account close in time to the murder by a phone number owned by Nelson.  In addition, the soliciting of C.H. and luring her to a particular location could have shown that planning.  The location itself was an area

Nelson was familiar with and would have reasonably known would be dark and somewhat secluded.

Nelson also asserts that by charging each count of murder separately the State deprived him of due process by securing what he calls a "compromise verdict." Nelson reasons that because all of the acts constituted the same course of conduct, he could only be convicted of one count of murder. And as a result, the State's decision to separately charge allowed the jury to reach a compromise and convict on the lesser charge. Nelson offers no caselaw in support of his proposition that the State erred.[12] The only question before us is whether the evidence supports the charges. As discussed above, evidence supported the charge of murder in the first degree. And Nelson does not argue that the evidence was insufficient to support the murder in the second degree charges. It is not our role to determine why the jury reached its verdict, or whether the jury compromised, because "[t]he individual or collective thought processes leading to a verdict 'inhere in the verdict' and cannot be used to impeach a jury verdict." State v. Ng, 110 Wn.2d 32, 43, 750 P.2d 632 (1988) (quoting State v. Crowell, 92 Wn.2d 143, 146, 594 P.2d 905 (1979)).[13]

Nelson's due process rights were not violated by the State's charging decision.

---

[12] Our Supreme Court has recognized the importance of lesser included instructions where a defendant is charged with only one crime. Instead of the jury having to choose between two harsh options: convicting as charged or allow to go free, "[a] lesser included offense instruction provides a third option, allowing the jury to reach a 'compromise verdict' by convicting the defendant on a less serious offense than the one charged by the State." State v. Bertrand, No. 100953-4, 2024 WL 16665994, at *5 (Wash. April 18, 2024).

[13] In his brief, Nelson cites several law review articles that opine on the problems with affording prosecutors such wide discretion. But this is a policy question and should properly be addressed to the legislature.

V

Nelson argues there was insufficient evidence to impose a firearm enhancement under RCW 9.94A.533(3).  We disagree.

Sentencing enhancements apply if the defendant was armed with a firearm when committing a felony.  RCW 9.94A.533(3).  Firearm enhancements are analyzed under the sufficiency of the evidence standard.  State v. McKee, 141 Wn. App. 22, 30, 167 P.3d 575 (2007).  When analyzing whether evidence is sufficient to uphold a jury's verdict, this court views "the evidence in the light most favorable to the State," to determine whether "any rational trier of fact could have found guilt beyond a reasonable doubt."  Salinas, 119 Wn.2d at 201.  "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant."  Salinas, 119 Wn.2d at 201.  "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."  Salinas, 119 Wn.2d at 201.  Both direct and circumstantial evidence may be considered to support the jury's verdict and "[a] trier of fact may rely exclusively upon circumstantial evidence to support its decision."  State v. Jackson, 145 Wn. App. 814, 818, 187 P.3d 321 (2008).

C.H.'s cause of death was a gunshot wound to the back of her head.  The jury found beyond a reasonable doubt that Nelson was the person who caused C.H.'s death.  And the jury found that Nelson was armed with a firearm at the time of the crime.

Viewing the evidence in the light most favorable to the State, although a firearm was never recovered, C.H. was killed by a firearm.  Sufficient circumstantial evidence supports the jury's finding that Nelson was armed with a firearm at the time of the crime.

VI

Nelson asserts that the trial court erred in denying his motion to suppress evidence seized through a search warrant for Facebook records because the search warrant failed to describe with sufficient particularity the things to be seized. We disagree.

A

As part of his investigation, Detective Kim interviewed Lauren Daniels about the cell phone number associated with the "Dickmeher" Google account. Daniels reported renting the phone number from Nelson for six months in 2015 and from 2016 until January 2017. Nelson contacted Daniels via Facebook Messenger in October 2017 asking if she wanted to repurchase the phone number from him.

Detective Kim sought and obtained a search warrant for certain Facebook records for two usernames: Sha'keira Pyt Williams and Rick Saints. Williams is the Facebook username of Daniels and Saints is the username for Nelson. The warrant first directed the seizure of the basic subscriber information and user neoprint, expanded subscriber content and user profile. The warrant then directed seizure of these records from October 24, 2017, the day before C.H.'s murder, to present: user posts; user photoprint; internet protocol (IP) logs; private messaging/messenger; deleted content; and records identifying other persons with whom the user communicated.

Nelson challenged the warrant under CrR 3.6. Nelson conceded that there was probable cause for "the single exchange between Ms. Daniels and Mr. Nelson regarding the cell phone number ending in 9127." And during argument on Nelson's motion to

suppress, defense counsel conceded that the State had probable cause for "that specific phone number, communications with Lauren Daniels and Kerri Roth, and maybe even [C.H.]" and information from Facebook on who the user is and who the account belongs to.

The trial court denied Nelson's motion to suppress finding the warrant and affidavit together were sufficiently particular.

The State then submitted a second affidavit for search warrant for essentially the same categories of information but limiting the information requested and the dates to two date ranges: October 24, 2017 to October 31, 2017; and December 22, 2017 to December 25, 2017. Defense counsel did not object to the new affidavit. The second search warrant was authorized by the trial court.

From the Facebook records, investigators discovered that around 6:00 p.m. on October 24, 2017, Nelson posted an update to his Facebook account from an identical IP address as the creation of the "Dickmeher" account.

B

Our constitutions protect individual privacy against warrantless state intrusion. U.S. CONST. amend IV; WASH. CONST. art. I, § 7; State v. Denham, 197 Wn.2d 759, 766, 489 P.3d 1138 (2021). A court may issue a search warrant only after a showing of probable cause. State v. Haggard, 9 Wn. App. 2d 98, 109, 442 P.3d 628 (2019), aff'd, 195 Wn.2d 544, 461 P.3d 1159 (2020). Probable cause exists if the warrant's supporting affidavit sets forth facts sufficient to establish a reasonable inference that a person is probably involved in criminal activity and the evidence of the crime could be found in the place to be searched. Haggard, 9 Wn. App. 2d at 109.

-22-

A search warrant must be sufficiently particular so that the officer executing the warrant can reasonably determine and identify the property authorized to be seized. State v. Besola, 184 Wn.2d 605, 610, 359 P.3d 799 (2015). The particularity requirement both "limit[s] the executing officer's discretion" and "inform[s] the person subject to the search what items the officer may seize." State v. Riley, 121 Wn.2d 22, 29, 846 P.2d 1365 (1993). "Warrants for materials protected by the First Amendment require a heightened degree of particularity." Besola, 184 Wn.2d at 611.

In this case, whether the first search warrant satisfied the particularity requirement is immaterial because the trial court issued a second search warrant that was more particular.

If the evidence procured by unlawful police action was "obtained pursuant to a valid warrant or other lawful means independent of the unlawful action," the evidence is not subject to exclusion under the independent source doctrine. State v. Betancourth, 190 Wn.2d 357, 364-65, 413 P.3d 566 (2018). We determine whether challenged evidence has an independent source by asking whether the illegally obtained information affected (1) the court's decision to issue the warrant or (2) the decision of the state agents to seek the warrant. Betancourth, 190 Wn.2d at 365. If the illegally obtained information did not affect the court's decision to issue the warrant or the decision of the state agents to seek the warrant, then the evidence is "admissible through the lawful warrant under the independent source doctrine." Betancourth, 190 Wn.2d at 365.

Here, the trial court's decision to issue the second warrant was not affected by or made relying on information obtained in the search pursuant to the first search warrant.

The second search warrant affidavit was essentially the same as the first search warrant affidavit. But the requested records, while essentially the same categories of information, were more limited and the time was limited to two short date ranges.

While the first search warrant may not have been sufficiently particular, under the independent source doctrine, the information obtained under the first search warrant was admissible as long as the second search warrant was valid. Defense counsel did not object to the second search warrant. Nelson has thus waived the argument that the second search warrant was invalid. RAP 2.5(a); State v. Robinson, 171 Wn.2d 292, 304, 253 P.3d 84 (2011). The evidence was admissible under the independent source doctrine.

VII

Lastly, Nelson argues that the $500 VPA and $100 DNA collection fee should be stricken from his judgment and sentence. The State does not dispute that Nelson is indigent and concedes that this matter should be remanded to strike the VPA and DNA collection fee from Nelson's judgment and sentence. We accept the State's concession.

In 2023, the legislature amended RCW 7.68.035 to prohibit courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3). LAWS OF 2023, ch. 449, § 1. In addition, the legislature eliminated the DNA fee entirely. LAWS OF 2023, ch. 449, § 4. Our courts have held that recent amendments to statutes governing LFOs apply retroactively to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

We remand to strike the VPA and DNA collection fee from Nelson's judgment and sentence. We otherwise affirm.

_Mann, J._

WE CONCUR:

_Coburn, J._          _Dwyer, J._