# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59924-4-II |
| Respondent, | |
| v. | |
| ADDISON DEE INMAN, | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, J. – Addison Inman appeals his convictions of second degree assault with sexual motivation and second degree rape and his sentence. The convictions arose out of an incident involving Inman and his wife, TI.

At trial, TI testified that Inman hit her in the face with a tennis ball as she walked into their house. TI testified that after Inman unsuccessfully attempting to engage in sexual activity with her, he dragged her up a set of stairs by her ponytail, restrained her in their bed possibly with handcuffs, and raped her. There was testimony that Inman's assault and rape left TI with a black eye, bruising on her wrists, and vaginal bleeding for several days.

Inman's primary theory of his defense was a general denial and that TI lied about the assault and rape. He also argued that even if he assaulted TI, she was not substantially injured because she could engage in normal activities in the following days. Inman's defense counsel

failed to disclose defense witnesses until the night before trial. After the close of the State's case, the trial court excused the jury for several hours and asked defense counsel to walk through his evidence piece by piece to determine its admissibility.

Inman offered evidence in the form of (1) videos of TI driving away from and returning to her house four days after the incident in order to establish that TI was not injured, (2) testimony from TI's son, daughter-in-law, and granddaughter that TI appeared okay and uninjured three days after the incident, (3) testimony about how the handcuffs used to possibly restrain TI appeared in the house, and (4) testimony that the Inmans' dogs would have barked if something bad was happening. The trial court excluded much of this evidence as cumulative of Inman's other proposed witness testimony, irrelevant, or speculative.

We hold that (1) Inman's second degree assault and second degree rape convictions do not violate double jeopardy, (2) the trial court did not abuse its discretion in excluding certain evidence and did not violate Inman's right to present a defense, and (3) the trial court did not violate the appearance of fairness doctrine. Accordingly, we affirm Inman's convictions of second degree assault with sexual motivation and second degree rape and his sentence.

FACTS

*Background*

At the time of trial, Inman and TI had been married for 19 years.

On Thursday, April 14, 2022, TI returned home from work at around 8:00 PM. TI testified that as soon as she opened the front door of the house, Inman threw a tennis ball at her that hit her in her right eye. TI believed that Inman was drunk. Inman made comments that implied that he wanted to engage in sexual activity. TI responded that she was too tired and wanted to sit.

TI testified that Inman then grabbed her by her ponytail and pulled her upstairs to their bedroom. Inman threw TI on their bed. TI testified that she felt "chained up" on the bed and had something around her wrists, but could not see what was around her wrists. Rep. of Proc. (RP) at 401-02. Inman then raped TI.

TI testified that she still felt pain from the assault the next day. Her memory was hazy because Inman gave her muscle relaxers after the assault. TI stated that in the following days her son Thomas Inman[1] and his wife Haley visited. Inman told TI to tell Thomas that her black eye was from allergies.

On Monday, April 18, TI went to work but left early when she felt lightheaded and what she described as "gushing" in her abdomen. RP at 411. TI realized she was bleeding.

TI's friend Lynn Williams visited TI on April 18. Williams testified that she saw TI with a black eye and using a heating pad on her abdomen. Williams stated that TI's hands were shaking and that she had to feed TI. TI was unable to stand up. Williams called an ambulance.

Sergeant Greg Catton along with the fire department responded to Williams's call for an ambulance. He noticed bruising around TI's wrists. Catton testified that while firefighters tended to TI, he saw a pair of metal handcuffs in the home. Catton testified that TI recoiled when asked about the handcuffs. At the hospital, TI told a nurse that Inman was responsible for her injuries.

The State charged Inman with second degree assault with sexual motivation and second degree rape.

---

[1] Except for Addison Inman, this opinion refers to everyone with the last name Inman by their first name for clarity. No disrespect is intended.

*State's Case and Motion to Dismiss*

In the State's case in chief, TI and the other witnesses testified to the facts stated above. After the close of the State's case, Inman moved to dismiss the second degree assault charge due to insufficient evidence of substantial bodily harm.

In response, the State argued that Inman assaulted TI in a number of ways that could be characterized as a "continuing assault." RP at 779. The State argued that Inman struck TI with a tennis ball that caused two weeks of bruising, which on its own met its burden of proof. In addition, the State argued that there was evidence of harm from handcuffs and TI's pelvic bleeding.

The trial court stated that the bruising to TI's eye from the tennis ball and her wrist pain from the handcuffs was sufficient for a jury to find substantial bodily harm and denied the motion.

*Inman's Case and Evidentiary Rulings*

The day before trial, Inman had sent the State an updated list of defense witnesses. The State argued that it did not have a meaningful opportunity to investigate Inman's late-disclosed witnesses.

Inman called Debbie Whittaker, a neighbor of the Inmans, to testify. Whittaker testified that she had a doorbell camera that captured video of the front of the Inmans' home.

Inman offered into evidence a video from Whittaker's doorbell camera of Inman's truck leaving his house at 6:51 AM on Monday, April 18. Inman argued that this was factual evidence of who was at the house at the time.

The trial court appeared to grow frustrated with Inman's defense counsel. The court asked Inman why he was offering the video and how it was relevant. Defense counsel responded

that the video showed who was and was not home on that date – four days after the alleged incident.

> After dismissing the jury for the afternoon, the trial court stated to defense counsel,

> So perhaps, um, it'll be easier, I think, for the Court to begin to make determinations if I understand what your theory of the case is; okay? So I don't really understand what your theory of the case is at this point, other than general denial that these events did not happen. Okay. So, um, why don't you give me a summary of what your theory of the case is and how -- what you -- you know, in summary, what each of these witnesses would testify to and how that's relevant within the context of your theory of the case.

RP at 823-24.

Inman subsequently offered two of Whittaker's videos from the morning of April 18 of TI driving away from her house and returning home in her car. Inman did not say specifically what the first video showed other than TI driving the car,[2] but the second video did not show TI getting out of the car. Inman argued that the video was relevant because it showed that TI was able to drive despite her alleged injuries. Inman also argued that the videos would corroborate Whittaker's expected testimony regarding her observations of TI walking to her car and getting into the car. The trial court stated, "You wanted to offer eyewitness testimony and video. I'll give you a choice. One of the two of them's cumulative, so you choose what you want to offer." RP at 850. Inman chose to present Whitaker's testimony and the trial court excluded the videos as cumulative.

The trial court noted that defense counsel had knowledge of Whittaker's testimony and did not disclose it to the State. The court stated,

> You know, what you're doing right now is you're frustrating me . . . because you're now indicating to me that recently you talked to this witness, okay, and received all

---

[2] Inman states in his brief that the first video showed TI walking to her car and getting in. But Inman did not give that description to the trial court. Inman stated only that it would be corroborative of TI's ability to drive and would corroborate Whittaker's testimony.

this information of the witness, but you didn't disclose that to the State. . . . [Y]ou are burning up my time on things that you should have done beforehand. I am very unhappy.

RP at 857.

Because of the length of time it took to determine the admissibility of the video exhibits, the trial court asked Inman to walk through his witnesses' proposed testimony to avoid prolonging the trial with objections where the jury would have to be removed.

Inman stated that Whittaker would testify that TI appeared to be normal and not injured the Sunday after the assault. Inman argued that this evidence was relevant because it would contradict the State's evidence that TI was injured. The trial court stated that Whittaker could testify about what she observed, but she could not testify that TI appeared uninjured because that was an inadmissible lay opinion.

Inman next discussed the proposed testimony of Joshua Roy, who rented rooms in the Inmans' house. Inman stated that Roy would testify that on April 14, he saw Inman and TI and that nothing out of the ordinary occurred. Inman stated that Roy would testify he could hear what was happening in the house and there was no indication of violence. Inman also stated that Roy would testify that the Inmans' dogs were excitable and normally would bark if there were sudden movements, raised voices or violence, but they did not bark that night. The trial court stated that whether dogs would have barked if there was a violent incident that night was inadmissible lay opinion and was speculative. The court stated that Inman could not ask questions like "Would the dogs have barked if . . . something bad was happening?" RP at 870.

Inman also stated that Roy would testify that on April 15, the day after the incident, he saw TI and she behaved and moved normally and that he did not see any signs of injury. The

trial court stated that Roy could testify about what he observed, but could not give an opinion that TI did not appear to be injured.

Inman next stated that three members of Inman's family would testify: his son Thomas, Thomas's wife Haley, and their 13-year-old daughter, PD. Inman stated that they would testify that they observed TI on the Sunday after the incident when they went to the Inmans' house for Easter. Inman admitted that Haley's testimony would mirror Thomas's testimony. PD's testimony would be slightly different because she baked a cake with TI.

The trial court excluded Haley's testimony about TI's condition because it was cumulative. The court also excluded PD's testimony because it was cumulative. In addition, the court noted that calling PD appeared to be an attempt to engender sympathy for Inman.

Inman also stated that Thomas and Haley would testify that the handcuffs located in the Inmans' house were found in their car after it had been stolen. They would testify that the handcuffs were locked and they did not have a key for them. The prosecutor stated that they were unaware of this proposed testimony.

The court stated to defense counsel,

> So you know, Counsel, you're putting me in a position -- you're putting me in a very difficult position right now. You know, this is discovery violation. All right? This is a discovery violation, and now you put me in a position where the State doesn't have an opportunity to engage in its own investigation of this. . . [Y]ou're coming forward now for the first time with evidence that offers a alternative explanation for the existence of a piece of State's evidence, um, you know, during trial, um, that you reasonably could have, and your client could have determined or discovered prior to the trial.

RP at 878. As Inman attempted to explain to the trial court that Thomas only brought the information to Inman's attention recently, the trial court stated, "Just. . . stop talking." RP at 879.

The trial court ruled that evidence of how the handcuffs appeared in the Inman's home was irrelevant and confusing to the jury under ER 403. The trial court allowed Thomas to testify

7

that the handcuffs were locked and there was no key, but not his opinion as to whether they were nonfunctional.

Whittaker ultimately testified that on the Monday after the incident (the same day TI went to the hospital), she observed TI walk down her sidewalk and drive away in her car. She stated that TI walked normally. Whittaker testified that when TI returned home later that morning, she observed her walk from her car to the house carrying groceries.

Thomas testified that when he visited the Inman's home on the Sunday after the incident, TI was able to stand in the kitchen and bake a cake. Thomas stated that he did not see anything out of the ordinary. Thomas also testified that TI went up and down the stairs in order to do laundry. Thomas stated that TI did not appear to have any difficulty walking.

Roy testified that he could hear things that happened in the house. He stated that on the night of April 14 he did not hear any loud noises, angry talking, yelling, bumps or screams, or any noises out of the ordinary. Roy also stated that the Inmans had dogs that were prone to bark and would react to sudden movements. But he did not remember the dogs barking that night.

In addition, Roy testified that he saw TI on Saturday, the morning after the incident, and he did not recall seeing any injuries. On Sunday, Roy saw TI standing in the kitchen and did not see her lying down or not feeling well. He did not observe any injuries.

*Inman's Hospitalization*

After the discussion of evidentiary issues and Whittaker's, Thomas's, and Roy's testimony, Inman himself was supposed to testify. Inman stated that he was shaking because his blood sugar was high. The court asked Inman to consult a physician and continued trial until the next day.

The next day, defense counsel told the trial court that Inman had been hospitalized. Defense counsel stated that he did not believe that the trial could continue. The court stated, "There's tactical advantage to be gained by [Inman] for absenting himself here this morning, okay, and trying to create a situation to create a mistrial." RP at 1000. The court stated that it would not order a mistrial or dismiss the case. The court also suggested that Inman had been able to control his blood sugar and health throughout the trial up until he was supposed to testify. The court asked Inman's defense counsel to let the court know what Inman's prognosis was and if he would be able to continue trial.

The next Monday, Inman still was hospitalized. Inman's defense counsel presented a letter from a physician assistant stating that Inman was admitted to the hospital and remained hospitalized, but provided no further details. Inman's defense counsel stated that the hospital would not release additional medical records.

The trial court noted that the physician assistant's note did not provide the information the court asked for, but he could not rule that Inman voluntarily absented himself from the trial. The court stated that it did not understand why Inman could not permit a treating physician to provide more information. The court stated,

> I'll be candid and say your -- your discussion or -- or description to me, uh, of what's occurring right now is inconsistent with my experience in many other cases . . . I've read many letters from treating physicians about, you know, conditions of various individuals. So it's pretty common for them to write these sorts of letters to the Court.

RP at 1038.

The court stated that the documents Inman's defense counsel provided where the "most sketchy . . . I've ever seen." RP at 1039. The court stated that Inman's defense counsel's comments about the hospital being unable to release records due to privacy laws "have no weight

9

with the court . . . I instructed you to have [Inman], you know, sign a authorization to release his medical records." RP at 1041.

Inman returned to court the following day. Inman then testified. He denied assaulting or raping TI.

*Closing Argument and Verdict*

The State did not request a jury instruction specifying that the assault and rape convictions must be based on separate and distinct acts. An instruction stated, "Sexual motivation means that one of the purposes for which the defendant committed the crime was for the purpose of his or her sexual gratification." Clerk's Papers at 67.

During closing argument, the prosecutor argued that the second degree rape occurred in the Inman's bedroom. The prosecutor stated,

> [TI] was forcibly raped, that [Inman] took her upstairs, that he forced his fingers inside of her, and that he put his mouth and his fingers on her vagina, and penetrated her body. . . . [S]he was pinned to the bed, first, by [Inman's] hand, then by his body, and then finally by something around her wrists, those handcuffs.

RP at 1187.

Regarding the assault, the prosecutor stated that Inman "perpetrated a near continuous assault from the moment [TI] walked through the door." RP at 1087. The prosecutor argued,

> [TI is] being struck in the eye by that tennis ball, grabbed by the arm, grabbed by the ponytail, forced onto the bed, restrained by the wrists. As a result of that assault, [TI] sustained significant injury. She was bruised, she was bloody.

RP at 1087-88. Later, the prosecutor stated, "[TI] said that this assault began when Addison Inman struck her in the eye with a tennis ball. And you saw pictures of the bruising . . . You also heard from every witness that came through here, this bruising was obvious, this was a black eye." RP at 1189.

10

The jury found Inman guilty of second degree assault and second degree rape. The jury also found that the assault was committed with sexual motivation. Inman appeals his convictions and his sentence.

ANALYSIS

A.   DOUBLE JEOPARDY

Inman argues that his convictions of second degree assault with a sexual motivation and second degree rape violate double jeopardy. We disagree.

1.   Legal Principles

A defendant is protected against multiple punishments for the same offense under the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution. Therefore, a defendant cannot be convicted twice for the same offense. *In re Pers. Restraint of Knight*, 196 Wn.2d 330, 336, 473 P.3d 663 (2020). We review double jeopardy claims de novo. *Id.* And a defendant may raise a double jeopardy claim for the first time on appeal. *State v. Sanford*, 15 Wn. App. 2d 748, 752, 477 P.3d 72 (2020).

The double jeopardy clause prohibits only the imposition of separate punishments for the same offense. *State v. Ray*, 5 Wn.3d 350, 362, 575 P.3d 321 (2025). Therefore, to resolve a double jeopardy claim, we must determine whether the defendant's convictions punish the same offense or two different offenses. *Id.* "Double jeopardy is violated if, but only if, both convictions punish the same offense." *Id.*

We apply a four-part analysis in evaluating double jeopardy claims. *Id.* at 363. First, we determine whether there is an indication of the legislature's intent to impose separate punishments for the same conduct. *Id.* at 363-64.

Second, we apply the *Blockburger*[3] test. *Id.* at 364. This test asks whether the two offenses are both the same in fact and in law. *Id.* at 367. The result of the Blockburger analysis creates a presumption of legislative intent. *Id.* at 364.

Third, we consider the merger doctrine. *Id*. at 364. " 'Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime.' " *State v. Arndt*, 194 Wn.2d 784, 819, 453 P.3d 696 (2019) (quoting *State v. Freeman*, 153 Wn.2d 765, 772-73, 108 P.3d 753 (2005)). But there is an exception to the merger doctrine: separate punishments for crimes that otherwise would merge are permitted "when overlapping offenses have independent purposes or effects." *Arndt*, 194 Wn.2d at 819.

Fourth, we consider other indicators of legislative intent that could overcome the *Blockburger* presumption. *Ray*, 5 Wn.3d at 364.

2.    Relevant Statutes

RCW 9A.36.021(1)(a) states that a person is guilty of second degree assault if the person "[i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm" in a manner not amounting to first degree assault. Substantial bodily harm is "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b).

The State may pursue a special allegation of sexual motivation in every criminal case (except sex offenses) "when considered with the most plausible, reasonably foreseeable defense that could be raised under the evidence, would justify a finding of sexual motivation by a

---

[3] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 396 (1932).

reasonable and objective fact finder." RCW 9.94A.835(1). Sexual motivation "means that one of the purposes for which the defendant committed the crime was for the purpose of his or her sexual gratification." RCW 9.94A.030(48).

RCW 9A.44.050(1)(a) states that a person is guilty of second degree rape when "the person engages in sexual intercourse with another person . . . [b]y forcible compulsion" in a manner not constituting first degree rape. Forcible compulsion is "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." RCW 9A.44.010(3).

By contrast, third degree rape is when a person engages in sexual intercourse with another person without their consent or "[w]here there is threat of substantial unlawful harm to property rights of the victim." RCW 9A.44.060(1)(b).

   3.   Analysis

       a.   Legislative Intent

First, we determine whether the legislature intended to impose separate punishments for both offenses. *Ray*, 5 Wn.3d at 363-64. Here, as the State concedes, there is no indication that the legislature intended to authorize separate punishments for second degree assault and second degree rape.

       b.   *Blockburger* Test

Second, we analyze whether the offenses are both the same in fact and in law. *Ray*, 5 Wn.3d at 367. We need not determine whether the two offenses here are the same in fact because they clearly are not the same in law.

13

To determine whether two offenses are the same in law, we ask whether each offense requires proof of a fact that the other offense does not. *Id.* at 370. We consider the to-convict elements for each offense, and the offenses are not the same in law if the elements of one offense would not be sufficient to sustain a conviction for the other offense. *Id.*

Second degree assault required the State to prove (1) intentional assault and (2) substantial bodily harm. RCW 9A.36.021(1)(a). By contrast, second degree rape required the State to prove (1) sexual intercourse and (2) forcible compulsion. RCW 9A.44.050(1)(a). Substantial bodily harm is required for second degree assault but not for second degree rape,[4] and sexual intercourse is required for a second degree rape but not for a second degree assault. So each crime requires proof of a fact the other does not. Therefore, the offenses are not the same in law. Accordingly, second degree assault and second degree rape presumptively are not the same offense. *Ray*, 5 Wn.3d at 372.

  c. Merger Doctrine

Third, we analyze whether second degree assault with sexual motivation and second degree rape merge. *Ray*, 5 Wn.3d at 364. The question is whether Inman's second degree assault raised the degree of his rape from third degree to second degree. *See Arndt*, 194 Wn.2d at 819. And an exception to the merger doctrine applies when the two offenses have an independent purpose or effect. *Id.*

Inman argues that his two offenses merge because the second degree assault established the element of forcible compulsion to increase third degree rape to second degree rape. And he asserts that there was no assault that had an independent purpose because the State argued that he

---

[4] Forcible compulsion does not require evidence of substantial bodily harm. *See* RCW 9A.44.010(3)

14

committed a continuing assault beginning when TI was struck with the tennis ball. The State argues that hitting TI with the tennis ball did not involve forceable compulsion and therefore did not elevate the degree of rape and that throwing the tennis ball had an independent purpose from the rape. We agree with the State.

i. Effect of *Ray* Statement

In *Ray*, the Supreme Court recently stated that "the merger doctrine is applicable *only* in cases involving lesser included offenses." 5 Wn.3d at 364 (emphasis in original). Here, second degree assault clearly is not a lesser included offense of second degree rape. Therefore, if this statement is taken at face value, the two offenses could not merge in this case.

However, the statement in *Ray* is confusing because the well-established formulation of the merger doctrine does not limit its application to lesser included offenses. " 'Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime.' " *Arndt*, 194 Wn.2d at 819 (quoting *Freeman*, 153 Wn.2d at 772-73); *see also State v. Muhammad*, 194 Wn.2d 577, 618, 451 P.3d 1060 (2019) (plurality opinion by Gordon-McCloud, J.); *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 524-25, 242 P.3d 866 (2010); *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983).

*Ray* did not overrule these cases and in fact cited to *Arndt* and *Muhammad* to support its statement. 5 Wn.3d at 364. And it seems unlikely that the Supreme Court would abrogate an entire theory of double jeopardy through one sentence in an opinion where it was not dispositive to the outcome of the case. Therefore, we interpret *Ray's* use of the phrase "lesser included" as referring not to lesser included offenses as a term of art, but more generically to any offense that raised the degree of the charged offense.

In any event, the State does not argue that the statement in *Ray* precludes application of the merger doctrine in this case. Therefore, we do not need to resolve this issue.

ii. Assault Elevating Degree of Rape

Here, Inman claims that the second degree assault provided the forcible compulsion needed to raise the degree of the rape from third degree to second degree. He asserts that without the assault, Inman could have been convicted only for third degree rape. But we conclude that even if the assault and rape convictions merge, the independent purpose exception applies.

The State argues that there were three distinct acts of assault: hitting TI in the face with a tennis ball, pulling TI upstairs by her ponytail, and restraining TI on the bed. Only restraining TI on the bed provided the forcible compulsion needed to prove second degree rape. Hitting TI in the face with a tennis ball did not constitute forcible compulsion and arguably had nothing to do with the rape. Because hitting TI with the tennis ball supported the second degree assault conviction, *that* assault did not raise the degree of the rape.

We conclude that Inman throwing the tennis ball at TI and giving her a black eye had an independent purpose or effect from when he raped her. TI testified that Inman threw the tennis ball at her as soon as she walked through the front door of their home. Only after that occurred did Inman attempt to engage in nonconsensual sexual activity with TI. Inman's throwing the tennis ball at TI injured TI in a distinct manner from the assault that could establish forcible compulsion for his second degree rape conviction.

Inman argues that the State's theory at trial was that Inman continually assaulted TI, not that there were three separate assaults. He argues that because Inman's conviction was based on one continuous assault, that single assault necessarily established the element of forcible

compulsion for second degree rape. Therefore, he argues that as proved to the jury, there was no assault that constituted an independent purpose.

The State did outline its theory of the case in a less than consistent manner. At times, the State represented to the trial court that there was a continuing assault. And during closing argument, the prosecutor stated that Inman engaged in a "near continuous" assault. RP at 1187. But the prosecutor also delineated three separate acts of assault – hitting TI with the tennis ball, grabbing TI by the ponytail, and restraining her in the bed. The prosecutor also specifically identified hitting TI with the tennis ball as an assault that caused significant bodily injury – bruising and a black eye. Although inartful, the State articulated to the jury that throwing the tennis ball at TI was an independent assault separate from the other two assaults and from the rape. And that separate assault did not involve forcible compulsion.

Accordingly, we hold that hitting TI with the tennis ball had an independent purpose from the rape and therefore that Inman's convictions for second degree assault and second degree rape do not merge.[5]

### d. Other Indicators of Legislative Intent

Fourth, we consider other indicators of legislative intent that could overcome the *Blockburger* presumption. *Ray*, 5 Wn.3d at 364. Inman does not argue that there are other indicators of legislative intent that would overcome the presumption that his second degree assault and second degree rape can be punished separately.

---

[5] Although Inman did not address the jury's finding that the assault for which they convicted Inman was committed with sexual motivation in his briefing, he did raise the issue at oral argument. This means that if the jury found that hitting TI with the tennis ball was the assault for which they convicted Inman, hitting TI with the tennis ball was committed with sexual motivation. However, sexual motivation is not the same as forcible compulsion.

4.      Conclusion

We hold that Inman's convictions of second degree assault and second degree rape do not violate double jeopardy.

B.      RIGHT TO PRESENT A DEFENSE

Inman argues that the trial court violated his right to present a defense by excluding video exhibits and witness testimony.  We disagree.[6]

1.      Legal Principles

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant's right to present a defense.  *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022).  The Supreme Court has developed a two-step process when addressing evidentiary rulings and the right to present a defense.  *Id.* at 58.  First, we analyze the trial court's rulings for an abuse of discretion.  *Id.*  "Trial courts determine whether evidence is relevant and admissible."  *Id.* at 59.  An abuse of discretion occurs if no reasonable person would take the trial court's position.  *Id.*

If we conclude that the trial court did not abuse its discretion in excluding the evidence, we consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense.  *Jennings*, 199 Wn.2d at 58.  We balance the State's interest in excluding the evidence against the defendant's need for the evidence.  *Arndt*, 194 Wn.2d at 812.  "In some instances regarding evidence of high probative value, 'it appears no state interest can be compelling enough to preclude its introduction.' "  *Id.* (quoting *State v. Hudlow*, 99 Wn.2d 1,

---

[6] Initially, the State argues that this court should decline to address Inman's arguments about the trial court's exclusion of video exhibits because the videos are not a part of the appellate record. However, in the trial court Inman provided ample explanation of the proposed content of the videos and the videos' intended purpose at trial.  We can sufficiently analyze Inman's arguments based on the existing record.

16, 659 P.2d 514 (1983). The exclusion of evidence does not violate the defendant's right to present a defense if the defendant still is able to present relevant evidence to support their central defense theory. *Arndt*, 194 Wn.2d at 812-13.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Although relevant, evidence still may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of . . . needless presentation of cumulative evidence." ER 403. Trial courts are permitted to " 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " *Jennings*, 199 Wn.2d at 63 (alteration in original) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

Under ER 701, lay witnesses may testify in the form of opinions or inferences which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702."

2.  Analysis

a.  Cumulative Evidence of TI's Physical Ability

Inman argues that the trial court violated his right to present a defense when it prevented him from presenting video evidence showing TI driving her car in addition to Whittaker's testimony on the ground that the video would be cumulative evidence under ER 403. We disagree.

Two of Whittaker's videos from the morning of April 18 show TI driving away from her house and returning in her car. But it is unclear whether the first video showed anything else and the second video did not show TI getting into or out of the car. Inman told the trial court that the video evidence would corroborate Whittaker's testimony about similar facts. In fact, Whittaker testified not only that she saw TI driving, but that she saw TI walking to and from the car and carrying groceries. Therefore, the videos did not add anything to Whittaker's testimony.

Inman argues that because the trial court did not see the videos, it abused its discretion. But Inman explained to the trial court the content of the videos and Whittaker's testimony.

Inman also argues that the evidence was not cumulative because it involved two different formats of evidence that would have offered multiple perspectives on TI's lack of injury. But that does not make the evidence less cumulative. It is unclear whether the videos showed anything other than TI's ability to drive, and Whittaker testified to that fact. There is no additional "perspective" that the videos could provide on this evidence. Therefore, we conclude that the trial court did not abuse its discretion in excluding the video evidence.

In addition, we conclude that the exclusion of the video evidence did not violate Inman's right to present a defense. Inman's need for the evidence was minimal because he had Whittaker's testimony to establish the same facts. Therefore, Inman still was able to support his theory that TI was not injured because she was able to drive.

b.    Evidence Regarding Handcuffs

Inman argues that the trial court violated his right to present a defense when it excluded evidence of where the handcuffs came from and Thomas's opinion that they were nonfunctional. We disagree.

It was undisputed that a pair of handcuffs was in Inman's home. The trial court ruled that how the handcuffs arrived into the home would not have made it more or less probable that Inman in fact used the handcuffs on TI as the State suggested. Inman argues that this evidence was relevant because it reinforced the testimony that there was no key to the handcuffs. Reasonable people could disagree about the relevance of this evidence, but the trial court has broad discretion to rule on evidentiary issues. We conclude that the trial court did not abuse its discretion in excluding that evidence of how the handcuffs appeared in Inman's home.

Regarding exclusion of Thomas's opinion testimony that the handcuffs were nonfunctional, the trial court specifically allowed Inman to elicit testimony that the handcuffs were locked and there was no key. Inman did not offer any basis for allowing Thomas to state his opinion as to whether they were nonfunctional. We conclude that the trial court did not abuse its discretion in excluding that evidence.

In addition, we conclude that exclusion of some handcuff evidence did not violate Inman's right to present a defense. Inman still was able to present his theory that the handcuffs could not have caused TI's wrist injuries because they were locked and there was no key.

c. Haley's and PD's Testimony

Inman argues that the trial court violated his right to present a defense when it excluded Haley's and PD's testimony about their interactions with TI on Sunday, April 17, three days after the alleged assault and rape. We disagree.

Inman sought to present evidence from Thomas, Haley, and PD about their observations that TI did not appear limited in her activities on Sunday. But Thomas and Haley were with TI at the same time, and Inman admitted that Haley's testimony would mirror Thomas's testimony. Therefore, Haley's testimony would not add anything. Similarly, PD's testimony would not add

anything and the fact that she baked a cake with TI was not particularly relevant. In fact, Thomas testified that TI could stand to cook dinner and work on baking a cake with PD. And Roy testified about his observations of TI on the same day that Haley and PD were there.

Inman argues that Haley and PD's testimony would have bolstered Inman's defense that TI was not substantially injured after the incident. But again the trial court has broad discretion to rule on evidentiary issues. Testimony from both the State and Inman showed that TI was ambulatory after the incident. We conclude that the trial court did not abuse its discretion in excluding the evidence as needlessly cumulative.

In addition, we conclude that exclusion of Haley's and PI's testimony did not violate Inman's right to present a defense. The jury heard testimony regarding TI's mobility a few days after the incident from Whittaker, Thomas and Roy, and Inman was able to cross-examine the witnesses who stated TI was injured. Therefore, Inman still could present his theory that TI did not suffer substantial injury.

### d. Roy's Testimony About the Dogs

Inman argues that the trial court violated his right to present a defense when it excluded Roy's testimony that the Inmans' dogs would have barked if something happened in the Inmans' house on the night of the incident. We disagree.

Inman stated that Roy would testify that the dogs would bark if there was sudden movement, raised voices, or violence. But Roy testified that he heard no raised voices or other unusual noises. And there was indication that Roy would know if the dogs would bark if Inman engaged in a movement like throwing a tennis ball. In addition, there is no indication that Roy would know whether the dogs would bark if the Inmans were engaged in sexual activities in their

bedroom. As a result, Roy's proposed testimony was speculative. We conclude that the trial court did not abuse its discretion in excluding the evidence on that basis.[7]

In addition, we conclude that the trial court did not violate Inman's right to present a defense. Roy was able to testify that the dogs were prone to bark and would react to sudden movements, and they did not bark that night. And Roy was able to testify that he did not hear any loud noises, angry talking, yelling, bumps or screams, or any noises out of the ordinary. Therefore, Inman still was able to present his theory that there were no noises that would indicate an assault or rape.

      e.    Whittaker/Roy Testimony Regarding TI's Ability to Walk

Inman argues that the trial court violated his right to present a defense when it excluded testimony from Whittaker and Roy about TI's ability to walk before she was hospitalized. However, the court did not preclude Whittaker or Roy from testifying about TI's ability to walk. The court stated that these witnesses could testify about what they observed – which presumably included TI's ability to walk – but they could not give an opinion that TI was not injured. Therefore, we reject this argument.[8]

C.    APPEARANCE OF FAIRNESS DOCTRINE

Inman argues that the trial court's behavior and prejudice toward him and his attorney violated the appearance of fairness doctrine. We disagree.[9]

---

[7] We do not address the trial court's ruling that this testimony would constitute an improper opinion.

[8] Because Inman does not raise this issue, we do not address the trial court's ruling that this testimony would constitute an improper opinion.

[9] Inman did not raise appearance of fairness in the trial court. The appearance of fairness doctrine is not a constitutional rule and an objection on that basis is deemed waived when not raised in the trial court. *State v. Tolias*, 135 Wn.2d 133, 140, 954 P.2d 907 (1998); *see also State*

23

1.    Legal Principles

"Pursuant to the appearance of fairness doctrine, a judicial proceeding is valid if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing."  *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). Under this doctrine, a presiding judge must actually be impartial and also appear to be impartial. *Id*.  The question is "whether the judge's impartiality might reasonably be questioned."  *Id*.

To make this determination, we apply an objective test that assumes a reasonable person knows and understands all the relevant facts.  *Id*.  The party asserting a violation has the burden of showing sufficient evidence demonstrating a judge's actual or potential bias.  *Id*.  Mere speculation is not sufficient.  *State v. A.W.*, 181 Wn. App. 400, 412, 326 P.3d 737 (2014).  And "[j]udicial rulings alone almost never constitute a valid showing of bias."  *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004).

2.    Analysis

Inman argues that the trial court violated the appearance of fairness doctrine by asking Inman's defense counsel to provide a summary of his theory of defense and asking for a summary of his witnesses' testimony.  Inman argues that by doing so, the trial court acted as an advocate for the State.

Inman's defense counsel disclosed proposed witnesses and exhibits the day before trial and presented the evidence to the trial court in an unclear manner.  The last minute nature of Inman's defense counsel's presentation of this evidence and his inability to provide a clear

---

*v. Blizzard*, 195 Wn. App. 717, 725, 381 P.3d 1241 (2016) (discussing the distinction between the waiver of appearance of fairness claims versus constitutional due process claims).  However, the State does not make a waiver argument on appeal.

answer as to the evidence's relevance resulted in a significant delay in the proceedings that warranted admonishment.

But the trial court took significant time to hear Inman's arguments and make clear rulings on all of Inman's proposed evidence. And the court did not advocate for the State in asking Inman about his theory of defense because Inman's defense counsel could not provide clear answers about why he wanted to present certain evidence. From the point of view of a reasonable observer who understands these facts, we conclude that the trial court did not express actual or potential bias toward Inman.

Inman also argues that the trial court violated the appearance of fairness doctrine in its comments regarding Inman's hospitalization. But the record does not reflect that the trial court expressed bias toward Inman. The court sternly asked why Inman's defense counsel could not have Inman release medical information to him in order to determine whether Inman's absence was voluntary or not. And defense counsel's statements to the court reflect that he could not provide the information the court requested. But this does not show that the trial court was biased toward Inman, as the court ruled that Inman's hospitalization was not voluntary.

Finally, Inman argues that the totality of trial court's behavior violated the appearance of fairness doctrine. But as noted above, Inman's defense counsel presented evidence late and in an unorganized manner, and could not provide requested information regarding Inman's absence, which explains the court's exasperation. And the court did not act in a manner that appeared impartial despite its frustration because it took time to carefully rule on all of the issues despite the delays. Therefore, we reject this argument.

Accordingly, we hold that the trial court did not violate the appearance of fairness doctrine.

No. 59924-4-II

D.     CUMULATIVE ERROR

Inman argues that the trial court's cumulative errors warrant a new trial. Because we reject Inman's claims of error, we also reject Inman's claim of cumulative error.

CONCLUSION

We affirm Inman's convictions for second degree assault with sexual motivation and second degree rape.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.


We concur:

_____
PRICE, A.C.J.

_____
GLASGOW, J.

26